WIGTON ET AL.; AETNA INSURANCE COMPANY, APPELLANT, *v.*
LAVENDER ET AL.; KIBLER, APPELLEE.

(No. 79-CA-23—Decided December 31, 1980.)

*Messrs. Glander, Brant, Ledman & Newman, Mr. Douglas
S. Roberts* and *Mr. J. Stephen Teetor,* for appellant.

*Michael F. Colley & Associates, Mr. Frank A. Ray,
Messrs. Wickham & Heald* and *Mr. Fred R. Wickham,* for
appellee.

McKEE, J.   This is an appeal from a directed verdict as to
liability rendered in favor of defendant-appellee, Michael
Kibler, and against plaintiffs at the close of plaintiffs' case in a
trial to a jury.

The active allegations giving rise to the issues before us
are set forth in the amended complaint of plaintiffs, Eldon D.
Wigton, Grange Mutual Casualty Company, Lightning Rod
Mutual Insurance Company and Aetna Insurance Company.
The first paragraph of the amended complaint alleged:

"On or about February 18, 1977, defendants, William
Lavender, Clyde L. Ward and Michael Kibler, all of whom
were then minors, unlawfully entered a barn located at 8526
Kilbourne Road, Sunbury, Ohio and willfully, maliciously, or
negligently, burned, damaged and destroyed said barn and its
contents."

The evidence at the trial itself indicated that defendants

Lavender, Ward and Kibler, agreed to "toilet paper" the premises of Eldon D. Wigton who was an instructor of Lavender and Kibler. Neither Lavender nor Kibler particularly liked Wigton.

Kibler drove Lavender and Ward to the premises of plaintiff Eldon D. Wigton and parked down the road. All three defendants climbed a fence, walked up behind Wigton's barn and entered the rear of the barn. The three did not "toilet paper" the premises because of the lights on the property.

While all three were in the barn, Lavender testified that the following conversation took place:

"Q. What was the conversation, if any, that transpired after Clyde Ward said something to the effect that, 'Let's burn the barn.'

"A. Well, me and Clyde said, 'Okay.'

"Q. I beg your pardon?

"A. Me and Clyde said, 'Okay.' And Mike [appellee Michael Kibler] said, 'No, we better not.' And Clyde goes, 'Yes. Let's do it.'

"And when I started to light the match, that's when Mike turned around and started for the door."

However, Kibler testified that he merely stated, "No" in his testimony:

"Q. On page 22, line 8, do you recall Mr. Vatsures asking you the following question: 'What did you do when you saw a match, what was your first course of action?'

"A. I don't remember that, no.

"Q. Mr. Kibler, at any point in time, did you attempt to prevent, in any manner, either Mr. Lavender or Mr. Ward from lighting the matches?

"A. Yes, when Clyde suggested it, I said 'No', and I turned around and started walking out.

"Q. That is the only course of action that you took?

"A. Yes."

Lavender stated that his first match went out and that he had to throw down another match at the time Kibler had left the barn.

At the trial, Kibler testified that he was not aware of the fire until everyone had returned to his car and they were driving down the road; at which time, he saw a glow against the sky. However, a detective of the Delaware County Sheriff's

Office testified that Kibler stated to him on, February 22, 1977 (four days after the fire), that "he [Kibler] noticed it first as he was leaving the barn."

As hereinbefore indicated, the trial court, at the close of plaintiffs' case, directed a verdict in favor of defendant Michael Kibler (and his parents, who were also defendants at that time) on all issues, as the court found no duty existed from Michael Kibler to Eldon D. Wigton.

All issues as to the other parties were resolved in the trial court, and a timely notice of appeal was filed by the appellant, Aetna Insurance Company, as to the final order of the court.

Appellant appeals only as to the verdict in favor of Michael Kibler and only as the directed verdict relates to the claimed cause of action arising from negligence. Appellant assigns the following as error:

"1. The trial court erred in granting [the] motion for a directed verdict of appellee, Michael Kibler, holding that Michael Kibler was not negligent as a matter of law.

"2. The trial court erred in not allowing the jury to decide whether appellee, Michael Kibler, was negligent."

The initial question before this court is whether defendant Michael Kibler is in the same position as an idle observer who can watch a blind man walk over a cliff and has no duty to cry out a warning or to take any action to save him. If defendant Kibler is in such a position, then the trial court was correct in its action.

We cannot so hold.

The evidence clearly established that defendant Michael Kibler agreed to trespass on Wigton's land with Lavender and Ward. While the agreed trespass was not for the purpose of burning Wigton's barn, the trespass was still continuing at the time the fire started.

In a scholarly review of tort principles, the late Judge Hart, in *Taylor* v. *Cincinnati* (1944), 143 Ohio St. 426, at page 432, said:

"To properly consider and determine tortious liability in accordance with legal principles, it is necessary to differentiate and classify the several types of tortious conduct. In general, they may be designated as follows: (1) Culpable and intentional acts resulting in harm; (2) *acts involving culpable and unlawful conduct causing unintentional harm;* (3) non-

culpable acts or conduct resulting in accidental harm for which, because of the hazards involved, the law imposes strict or absolute liability notwithstanding the absence of fault; and (4) culpable acts of inadvertence involving unreasonable risks of harm." (Emphasis added.)

Judge Hart later cites, at page 440, a case involving an " * * * action for damages for * * * permitting inmates to terrorize plaintiff and to trespass upon his property * * * ."

Surely an actual trespass creates at least an equal duty with permitting a trespass.

As was stated in *Cincinnati & Suburban Bell Telephone Co.* v. *Eadler* (1944), 75 Ohio App. 258, at pages 260-261:

" * * * Whenever and wherever one person comes into proximity to the person or property of another, a duty arises to refrain from conduct likely to cause injury or damage."

While defendant Kibler's claimed acts of negligence are of omission rather than of commission, this is not a valid distinction in Ohio. The court in *Harriman* v. *Ry. Co.* (1887), 45 Ohio St. 11, at page 24, stated:

" * * * If the neglect be the proximate cause of the injury, it is of no consequence whether it be omission or commission. * * * "

We find that when a person trespasses on the lands of another that, while the trespass continues, he owes a duty of care to the owner of the premises; and, such duty includes the obligation to protect the property from harm as a result of the trespass.

For the foregoing reasons the assignments of error are sustained. The judgment herein appealed from is reversed and this cause is remanded to the Court of Common Pleas of Delaware County for further proceedings according to law.

*Judgment reversed and*
*cause remanded.*

PUTMAN, P. J., concurs.

RUTHERFORD, J., dissenting. This is an appeal by plaintiff-appellant, Aetna Insurance Company, from a judgment entered by the Court of Common Pleas of Delaware County, on November 5, 1979, in favor of defendants Michael Kibler and his parents, Kenneth P. Kibler and Sonja Kibler.

The amended complaint filed by plaintiffs alleged, in part:
"1. On or about February 18, 1977, defendants, William Lavender, Clyde L. Ward and Michael Kibler, all of whom were then minors, unlawfully entered a barn located at 8526 Kilbourne Road, Sunbury, Ohio and willfully, maliciously, or negligently, burned, damaged and destroyed said barn and its contents."

Plaintiffs sought to recover damages from the three above-mentioned defendants, as well as from their parents, also defendants, pursuant to R. C. 3109.09. The claims of plaintiffs against the parents of William Lavender were disposed of several months prior to trial.

Trial commenced in the matter on October 15, 1979. Prior to the impaneling of the jury, the court entered a default judgment in favor of plaintiffs against defendant William Lavender on the issue of liability only.

At the close of plaintiffs' case, the court granted the motions of defendants Michael Kibler, Kenneth P. Kibler and Sonja Kibler, for directed verdicts in their favor against plaintiffs on all issues of liability. The judgment entry appealed from, in pertinent part, reads:

" * * * After the plaintiffs closed their case based upon the evidence submitted and stipulations * * * [offered and] agreed to by the parties [, the court] ruled upon several motions. The Court granted the oral three branch motion of defendants, Michael Kibler, Kenneth P. Kibler and Sonja Kibler, for a directed verdict on all issues of liability directing a verdict in favor of said defendants and against all of the plaintiffs as to the issue of liability based upon the alleged willful, intentional and malicious act of defendant, Michael Kibler, as to the issue of liability based upon the alleged negligent acts of defendant, Michael Kibler, and as to the issue of liability of Defendants, Kenneth P. Kibler and Sonja Kibler, arising of Section 3109.09 of The Ohio Revised Code thereby dismissing all of said three defendants from further proceedings against them."

The remaining defendants rested without presenting any evidence. The court then granted the motions of all plaintiffs for directed verdicts in their favor as to the issue of liability against defendant Clyde L. Ward on the basis of his " * * * willful, intentional and malicious acts, * * * " and

against the parents of Clyde L. Ward. The court also granted the motions of the plaintiff-insurance companies for damages against defendants William Lavender and Clyde L. Ward, and awarded damages against the parents of Clyde L. Ward pursuant to R. C. 3109.09. Plaintiffs dismissed their claims of liability based upon negligence against defendants William Lavender and Clyde L. Ward.

The court submitted to the jury the sole remaining question of fact, being the issue of damages caused to plaintiff Eldon D. Wigton by defendants Clyde L. Ward and William Lavender. The jury returned a verdict assessing damages in the amount of $50,000.

Plaintiff-appellant, Aetna Insurance Company, filed a timely notice of appeal from the judgment entered on November 5, 1979, and raises the following two assignments of error:

"1. The trial court erred in granting [the] motion for a directed verdict of appellee, Michael Kibler, holding that Michael Kibler was not negligent as a matter of law.

"2. The trial court erred in not allowing the jury to decide whether appellee, Michael Kibler, was negligent."

The only evidence presented by plaintiffs as to Michael Kibler's involvement in the incident was the testimony of Kibler and of defendant William Lavender, both of whom were called as upon cross-examination.

The pertinent portions of Michael Kibler's testimony are as follows:

"Q. Okay. So, you and Bill Lavender then went out to your property, your parents' property, in separate cars; is that right?

"A. I believe so, yes.

"Q. And what did you do that evening?

"A. I did my chores, that was about it. And then, came back in town, picked up Clyde [L. Ward] and I suggested that we go out to Eldon Wigton's and toilet paper.

"Q. That was the first conversation you had about going out to the Wigton property?

"A. Yes.

"Q. Was there any discussion about doing anything other than toilet papering the property up to that point?

"A. No.

"Q. Specifically, was there any statement about doing anything to Mr. Wigton's van, up until that point?

"A. No.

"Q. About what time of the evening was it when all three of you got together again?

"A. I don't recall, probably 6:30 or so.

"Q. And where did you go from there?

"A. From where?

"Q. From, I presume, Clyde Ward's house.

"A. Went to Kroger's and bought some toilet paper, and Clyde showed us how to get out to his house.

"Q. Did you get some gasoline?

"A. I don't remember.

"Q. So, it is your statement, then, after you got the toilet paper at Kroger's, as far as you recollect, you went directly to the Wigton property?

"A. Yes.

"Q. And that would be on Kilbourne Road in Kingston Township?

"A. I don't know about that.

"Q. When you got out on the road on which their property is located, as you approached the house, what did you do at that point in time?

"A. Now, rephrase that, will you? You mean approach the house with the car?

"Q. As you were driving up, approaching the house on the road—Okay. In other words, while you were still on the road, when you got near the Wigton property, what happened at that point?

"A. None of us knew where he lived, except for Clyde, and he pointed out where he lived. And then, we drove on by, and it was about dark, and I went down, and I turned around and drove slow, by his house, going back towards Delaware. And we decided there was too much light around there, so I started to drive on down, and stopped, and decided to go behind the barn and walk up behind the barn and toilet paper the trees up front.

"Q. So, you parked the car, you got out, climbed the fence—Did you, in fact, toilet paper any trees?

"A. No, I don't believe so.

"Q. After you left, did you take the toilet paper with you?

"A. No, I didn't.

"Q. On what side of the barn did you make—

"A. Would you state which side is which?

"Q. The side facing the road.

"A. Opposite the road?

"Q. On the far end then.

"A. Parallel with the road.

"Q. Okay. But, on the side furthest away from the road?

"A. Yes, I believe so, I'm not sure.

"Q. How long were you in the barn?

"A. I don't know, it wasn't very long, it didn't seem like.

"Q. While you were there, what was the conversation that transpired about what you were going to do in the barn?

"A. There wasn't any conversation about what was going to be done in the barn, we were walking through the shed there to walk around the front.

"Q. Did you look at Mr. Wigton's van?

"A. I don't remember it, no.

"Q. You didn't look at it and try to get in?

"A. No

"Q. To see if it was unlocked?

"A. No.

"Q. Did any one of the three of you walk into anything?

"A. I believe so.

"Q. Who did; do you know?

"A. I don't know.

"Q. Was the van wholly inside the barn?

"A. I don't know.

"Q. Okay. Do you remember the conversation that took place in the barn?

"A. When?

"Q. At the point apparently Clyde Ward suggested that the barn be burned down.

"A. Yes.

"Q. Where were you all at the time he first suggested that?

"A. At the back of the barn.

"Q. How far inside?

"A. About 15 feet.

"Q. That would be which one, which one of you was 15 feet inside, all of you?

"A. We were all in the back part of the barn, yes.

"Q. Were all of you at least 15 feet inside the barn?

"A. Yes.

"Q. And what did Bill Lavender say in response to that?

"A. I don't remember Bill saying anything.

"Q. Okay. Did you say anything in response to that?

"A. Yes, I said, 'No.'

"Q. Is that all you said, simply 'No'?

"A. Something to that effect, yes.

" * * *

"Q. Mike, you saw William Lavender throw down the match that lit the straw, did you not?

"A. No.

"Q. You did not?

"A. No.

"Q. You did not see him throw down either match?

"A. No.

"Q. Did you think that either one of them was about to throw down a match?

"A. I didn't know.

"Q. It is a pretty important question. Your statement to the jury at this point in time is that you do not know whether either of them—you do not know whether you knew whether either of them was going to throw down a match.

"A. Could you say that again?

"Q. My question was, I think, did you know that either of them was going to throw down a match.

"A. No, I didn't know that.

" * * *

"Q. Mr. Kibler, at any point in time, did you attempt to prevent, in any manner, either Mr. Lavender or Mr. Ward from lighting the matches?

"A. Yes, when Clyde suggested it, I said, 'No.' And I turned around and started walking out.

"Q. That is the only course of action that you took?

"A. Yes.

"Q. Did you, at any point in time, attempt to put out the match?

"A. No, I didn't see the match.

"Q. What was it that you anticipated was going on so that you would have run out of the building?

"Mr. Wickham: Objection. He didn't say he ran out.

"The Court: Now, wait a minute. It's the form of the question again, sustained.

"* * *

"Q. Did you * * * not run out of the building?

"A. No.

"Q. You just casually walked out of the building?

"A. Yes, I just walked out.

"Q. At what point in time did you become aware of the fact that there was a fire going on in the barn?

"A. I wasn't aware that there was a fire until later.

"Q. When was that?

"A. After we had all gotten in the car and driven down the road.

"Q. Uh-huh. As you were going out of the barn, what was the next thing that seemingly happened?

"A. I was outside of the barn, and I saw Clyde and Bill come running, and so I got scared and started running too.

"Q. Why did you surmise in your mind that they were running?

"A. I figured that they had lit the fire.

"Q. Did you tell them to stop?

"A. I didn't say anything.

"Q. Did you say that, 'we ought to go back and try to put it out'?

"A. No, nobody had mentioned that there was a fire.

"Q. But you thought that that is probably what had happened?

"A. Yes, I thought that.

"Q. You didn't look back around to confirm whether or not they had started a fire?

"A. No, I was outside of the building.

"Q. Who crossed the fence first? "

"A. I don't remember.

"Q. Before you crossed the fence or in crossing the fence, did you have occasion to look back over your shoulder to the barn?

"A. Yes, I may have.

"Q. Did you see any light that looked like a fire?

"A. No.

"Q. You did not?

"A. No.

"Q. You didn't see the glow that Mr. Lavender referred to in his testimony?

"A. After we were in the car and down the road quite a ways, I saw a glow in the sky.

"Q. Even though you suspected, as you just indicated to me in your testimony, that he probably lit the fire, you didn't make any effort to call the fire department?

"A. No.

"Q. You didn't make any effort to notify the Wigtons' that you thought that these two other boys had probably lit their barn on fire?

"Did you, at any point, tell the other two boys that you would not haul them back to Delaware?

"A. No."

The testimony of William Lavender corroborates the testimony of Michael Kibler. Defendant Clyde L. Ward was in Germany serving in the armed forces of the United States at the time of trial; and, being unable to appear as a witness, no testimony was otherwise introduced by deposition.

In opening statement, Douglas Roberts, counsel for plaintiff-appellant, Aetna Insurance Company, stated:

"The evidence will further show that regarding Michael Kibler, that perhaps he did not intentionally set the barn on fire or participate, in that way that he can be held accountable for that, but, nonetheless, he failed to use due care regarding the property of Eldon or Clayton Wigton."

Appellant's assigned errors, *supra,* are not related to the failure of the court to find an intentional tort upon the part of Michael Kibler; rather, each assignment of error relates to the finding of the court, as a matter of law, of no negligence of Michael Kibler, with respect to performance of a duty.

I find the assigned errors not to be well taken for two reasons:

(1) Negligence cannot be found for failure to perform a nonexistent duty. I find no common law or statutory duty of defendant Michael Kibler, under the facts of record in this case, and no Ohio case law so holding. Cases cited by appellant relate to personal injury rather than property damage. With reference to personal injury cases, a position has sometimes been taken that under certain circumstances a sufficient moral obligation arises that a legal duty should be imposed.

It is my opinion in the instant case that the facts of record are insufficient, as a matter of law, to give rise to a legal duty for the nonperformance of which defendant Michael Kibler could be found liable for damages.

(2) Assuming, *arguendo,* that the evidence of record is sufficient to impose a duty upon defendant Michael Kibler for failure to perform a duty from which a jury could find negligence on the part of defendant Michael Kibler, I find the evidence of record insufficient, as a matter of law, to demonstrate any act of Michael Kibler, which he failed to perform, which could be found to be *a proximate cause* of the damages resulting from the fire, which was not set by Michael Kibler and not intended by him.

In my opinion, each of appellant's two assigned errors ought to be overruled, and the judgment appealed from ought to be affirmed.