CLEMETS, ADMX., APPELLANT, *v.* HESTON ET AL., APPELLEES.

(No. WMS-84-15—Decided
February 15, 1985.)

*John C. Milliken,* for appellant.
*William A. Bish,* for appellees.

HANDWORK, J. This case is before the court on appeal from a judgment of the Williams County Court of Common Pleas.

Plaintiff-appellant, Melinda Clemets, is the administratrix for the estate of Thomas Clemets. She is appealing from the trial court's dismissal of her complaint for failure to state a claim upon which relief could be granted.

## I

Stating the appropriate legal test from an appellate court's perspective, the dismissal of an action, pursuant to a Civ. R. 12(B)(6) motion, will not be upheld on appeal unless it appears beyond doubt that the complainant can prove no set of facts in support of his claim that would entitle him to the relief prayed for. See *Dickerhoof* v. *Canton* (1983), 6 Ohio St. 3d 128, 129; *O'Brien* v. *University Community Tenants Union* (1975), 42 Ohio St. 2d 242 [71 O.O.2d 223]; *Hedrick* v. *Center for Comprehensive Alcoholism Treatment* (1982), 7 Ohio App. 3d 211; *Stephens* v. *Boothby* (1974), 40 Ohio App. 2d 197 [69 O.O.2d 189]. Also, in construing the allegations in the complaint for purposes of the motion to dismiss, a court is required to accept them as admitted by the movant to be true. See *Royce* v. *Smith* (1981), 68 Ohio St. 2d 106 [22 O.O.3d 332]; *State, ex rel. Alford,* v. *Willoughby* (1979), 58 Ohio St. 2d 221, 223 [12 O.O.3d 229]; cf. *Schulman* v. *Cleveland* (1972), 30 Ohio St. 2d 196, 198 [59 O.O.2d 196].

In the present case, the facts alleged in appellant's complaint can be summarized thusly. On the evening of October 29, 1983, Clemets was driving his car in Montpelier, Ohio, where he was stopped by Officer Thomas Heston, a patrolman for the village of Montpelier (and one of the defendants-appellees herein). Ostensibly, the officer stopped Clemets for reasons relating to erratic driving and for failing to stop at a stop sign. The complaint, however, alleges only that, once stopped, the officer determined that Clemets was intoxicated. He then arrested Clemets for driving while intoxicated. It was at this point that Heston observed, apparently in plain view on the car seat beside Clemets, a 20-gauge shotgun and several shotgun shells.

After arresting him, Heston drove Clemets to the Bryan Police Department for the purpose of administering an intoxilyzer test. (The complaint does not disclose whether the shotgun was taken along to Bryan or left behind in Clemets' car.) At the Bryan police station, Clemets refused to take the intoxilyzer test. The testing officer (a Bryan patrolman) detected an odor of alcohol about Clemets' person. His eyes were glassy and he appeared to be confused. Once the intoxilyzer-refusal forms were completed, and the DWI citation issued, Heston drove Clemets back to his vehicle in Montpelier. He left Clemets in possession of the shotgun and ammunition. Tragically, Clemets committed suicide through use of the shotgun. On December 28, 1983, appellant commenced this wrongful death action against Heston, the Montpelier Police Department and the village of Montpelier.

In bringing this appeal, appellant assigns as her only error the following:

"The trial court erred in granting the defendant's motion to dismiss for failure to state a claim upon which relief can be granted."

## II

### A

Essentially, appellant's complaint alleges that appellees' negligent failure to act proximately caused Clemets' death. In dismissing appellant's complaint, the trial court determined that because no legal duty existed toward Clemets, there was no actionable negligence and, therefore, no cognizable claim for relief stated. The trial court did not reach the parties' additional contentions regarding foreseeability, proximate cause and independent intervening agency. In this appeal, the parties apparently agree that the dispositive question is limited to: What duty, if any, did Officer Heston owe to Clemets?

While negligence actions always involve mixed questions of law and fact, the existence of a duty is, in the first in-

stance, a question of law for the court.[1] See *Railroad Co.* v. *Harvey* (1907), 77 Ohio St. 235, 240; *Porter* v. *Miller* (1983), 13 Ohio App. 3d 93, 96; *Keister* v. *Park Centre Lanes* (1981), 3 Ohio App. 3d 19, 22; Restatement of the Law 2d, Torts (1965), Section 328B(b) and at Comment *e*; see, also, Prosser & Keeton, Torts (5 Ed. 1984) 236, Section 37; cf. *Martinelli* v. *Cua* (1962), 115 Ohio App. 151, 152 [20 O.O.2d 246].

Negligence is posited here on the officer's failure to act when there arguably existed a positive duty to do so. Liability, then, is predicated on a theory of *nonfeasance.* Yet, even in cases of nonfeasance, the existence of a legal duty is still critical. Under Ohio law, unless such a duty is established, a defendant's mere failure to act does not create liability. *Taylor* v. *Continental Cas. Co.* (1945), 75 Ohio App. 299 [31 O.O. 53]; cf. *Wigton* v. *Lavender* (1980), 70 Ohio App. 2d 241, 251 [24 O.O.3d 349] (Rutherford, J., dissenting: "Negligence cannot be found for failure to perform a nonexistent duty.").

As Prosser states, "for 'nonfeasance' it is necessary to find some *definite relation* between the parties, of

such a character that social policy justifies the imposition of a duty to act." (Emphasis added; footnote omitted.) Prosser & Keeton, *supra,* at 374, Section 56. The kind of "duty" thus contemplated is one obligating the defendant to act toward the plaintiff in some affirmative manner in situations where a "definite relation" exists between them.[2] Our inquiry is to determine what particular kind of relationship is necessary to justify imposing on appellees a duty of affirmative action.

### B

In this context, the Restatement of Torts 2d, *supra,* provides some guidance:

"§ 314. Duty to Act for Protection of Others

"The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." *Id.* at 116.

"§ 314A. Special Relations Giving Rise to Duty to Aid or Protect

"* * *

"(4) One who is required by law to take * * * the custody of another under

---

[1] As the Ohio Supreme Court has frequently observed, the fact that a question of law involves the consideration of factual issues does not turn the former into a "question of fact" or necessarily mire the court in evidentiary issues of weight or credibility. See, *e.g., O'Day* v. *Webb* (1972), 29 Ohio St. 2d 215 [58 O.O.2d 424]; cf. *Ace Steel Baling* v. *Porterfield* (1969), 19 Ohio St. 2d 137, 139 [48 O.O.2d 169], fn. 2.

[2] This amorphous notion of what one means by a "duty" has itself been the subject of much spilled ink. Turning again to Prosser's observations:

"The statement that there is or is not a duty begs the essential question — whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law

of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. Yet it is embedded far too firmly in our law to be discarded, and no satisfactory substitute for it, by which the defendant's responsibility may be limited, has been devised. But it should be recognized that 'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." (Footnotes omitted.) Prosser & Keaton, Torts (5 Ed. 1984), Section 53, at 357-358.

Prosser concludes that the question of "duty," like that of "proximate cause," reduces itself to "whether the interests of the plaintiff are to be protected against the particular invasion by the defendant's conduct." *Id.* at 358.

circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." *Id.* at 118.

Section 314 states the general rule regarding a duty of "affirmative action." No such general duty exists. Section 314A(4), the only pertinent subsection, identifies the "special relation" which, in this context, gives rise to a duty to aid or protect another person. A law enforcement officer having custody of an arrestee or prisoner stands in a special relation to that person, toward whom he owes a duty of reasonable care and protection.[3] See *id.* at 120, Comment *e.*

This special relation arises upon arrest — *i.e.*, when the officer "takes the custody" of another, as "required by law." In the case of a misdemeanant, here a DWI offender, R.C. 2935.03 authorizes (indeed *requires*) the officer in whose presence the offense was committed to effect the perpetrator's arrest. Once the relationship thus begins, the duty to act affirmatively to protect the arrestee from harm and provide for his care and safety continues for the duration of that relationship — *i.e.*, until the arrestee-prisoner is released from custody.

While the special relation exists, the custodial officer's duty is only to exercise reasonable care under the circumstances, though certain circumstances may heighten the need for a higher degree of care than would others.[4] In any event, the custodial officer is not obligated to act until he knows or should know that the arrestee-prisoner is endangered, sick, injured or mentally disturbed. See Restatement of Torts 2d, *supra*, at Section 314A, Comments *b, e* and *f.*

### C

Having discussed briefly the Second Restatement's rules and the custodial context which they contemplate, we turn to the numerous cases cited by the parties in support of their respective positions. We quite agree with the general rule expressed in the cases appellant cites, though it has not received a consistent application. The general "custodial negligence" rule is that a jailer (or other custodial personnel, such as a sheriff or arresting officer) owes a duty to those in his custody to keep them safe and protect them from harm. The requisite standard of care is held to be that which is reasonable and ordinary for the health, care and well-being of the prisoner.[5] See, generally, Annotation (1977), 79 A.L.R. 3d 1210, 1216.

The case law supporting this general rule can be conceptually divided into three groups: the first, in which the prisoner commits suicide or otherwise

---

[3] Our reference to "law enforcement officer" should be understood as including any enforcement personnel who may act in the capacity of a "custodial officer" with respect to a prisoner or arrestee. This would, of course, include police officers, sheriffs (and their deputies), village or township patrolmen, jail personnel, etc.

[4] See, *e.g., Wilson* v. *Kotzebue* (Alaska 1981), 627 P. 2d 623, 628-629 (intoxicated prisoners or arrestees may heighten the duty and responsibility of custodial officers to see that they are protected from harming themselves or from harm by others).

[5] The rationale for this "custodial negligence" rule is frequently explained by quoting a rhetorical passage from an 1899 case decided by a federal court in Indiana:

"If the law imposes a duty of care in respect of animals and goods which he has taken into his possession by virtue of his office, why should not the law impose the duty of care upon him in respect of human beings who are in his custody by virtue of his office? Is a helpless prisoner in the custody of a sheriff less entitled to his care than a bale of goods or a dumb beast?" *Indiana, ex rel. Tyler,* v. *Gobin* (C.C.D. Ind. 1899), 94 F. 48, 50.

inflicts self-injury[6]; the second, in which the prisoner is killed or injured by another prisoner[7]; and the final group, in which the prisoner, while in custody, is permitted to suffer or debilitate from a pre-existing injury or illness without the necessary medical attention.[8]

Yet, none of these cases applies here precisely because Clemets, at the time of his suicide, was not "in custody," either within the context of the Second Restatement or within the meaning of that concept as illustrated by the case law counsel cites. The cases from other jurisdictions are, therefore, distinguishable on that ground alone. Again, as we have said, we have no disagreement with the general rule regarding "custodial negligence," see Annotation, *supra*, but the factual context here does not involve this kind of negligence, since Clemets was not under arrest, in jail or otherwise restrained of his liberty when he chose to kill himself. If negligence is present at all, it must be found in Heston's *releasing* Clemets to his vehicle. Therefore, the narrower issue becomes whether the officer negligently *released* appellant's decedent from custody.

## III

### A

Ohio law has not addressed the precise issue we face, but some decisions do exist which deal with the duties and liabilities of law enforcement officers (such as sheriffs) and we have reviewed them to determine if they offer guidance.[9]

Regarding such duties and liabilities, Ohio follows the rule that law enforcement officers (whether sheriffs or village marshals) generally can be held liable for their malfeasance, nonfeasance or neglect of duty. See *Vajner* v. *Orange* (1963), 119 Ohio App. 227 [27 O.O.2d 98]; cf. *American Guaranty Co.* v. *McNiece* (1924), 111 Ohio St. 532. For injuries proximately caused to innocent bystanders by their negligent acts, sheriffs have been held liable in damages. See *Young* v. *Kelley* (1938), 60 Ohio App. 382 [13 O.O. 1].

However, in the case of *nonfeasance,* liability appears to be much more limited. Thus, for example, a sheriff who investigated a traffic accident in which the plaintiff was injured, was held to be under no duty to investigate the accident diligently. Consequently, any

---

[6] There are many cases representative of this group. A few include: *Falkenstein* v. *Bismarck* (N.D. 1978), 268 N.W. 2d 787; *Shuff* v. *Zurich-American Ins. Co.* (La. App. 1965), 173 So. 2d 392; *Sudderth* v. *White* (Ky. App. 1981), 621 S.W. 2d 33; *Overby* v. *Wille* (Fla. App. 1982), 411 So.2d 1331. Some cases, while acknowledging the general rule, have nevertheless found that the custodial officers were not liable. See *Guice* v. *Enfinger* (Fla. App. 1980), 389 So.2d 270; *Pretty on Top* v. *Hardin* (Mont. 1979), 597 P.2d 58; *Delasky* v. *Hinsdale* (1982), 109 Ill. App. 3d 976, 441 N.E.2d 367; cf. *Lucas* v. *Long Beach* (1976), 60 Cal. App. 3d 341, 131 Cal. Rptr. 470.

[7] See, *e.g., Breaux* v. *State* (La. 1976), 326 So. 2d 481; *Daniels* v. *Andersen* (1975),

195 Neb. 95, 237 N.W. 2d 397; cf. *Justice* v. *Rose* (1957), 102 Ohio App. 482 [3 O.O.2d 39] (no liability).

[8] See, *e.g., Azure* v. *Billings* (Mont. 1979), 596 P. 2d 460 (intoxicated assault victim was confined in jail cell without medical attention, resulting in aggravation of his injuries); *Dunham* v. *Canisteo* (1952), 303 N.Y. 498, 104 N.E. 2d 872 (elderly man, obviously ill, died of pneumonia while in custody without medical attention).

[9] While this case involves a village patrolman rather than a county sheriff, the principles of liability here and those discussed in the sheriff cases are the same, so we may consider those cases for whatever analogous strength they may offer.

nonfeasance on the sheriff's part was not actionable, even if he had breached a duty owed to some third party or agency, since none was owed to the plaintiff. See *Reckman* v. *Keiter* (1959), 109 Ohio App. 81 [10 O.O.2d 252]. More recently, the Fifth District Court of Appeals held that no duty existed toward a person who was injured by an escaped psychiatric patient, whose escape the sheriff had been investigating, because there was no "special relationship giving rise to a legal duty" on the sheriff's part to protect the victim. See *Epling* v. *Cardarelli* (1983), 13 Ohio App. 3d 142, 144.

In a case somewhat more analogous to the present one, the court held that the sheriff was *not* liable to a prisoner injured in an assault by another prisoner while both were confined in the same jail cell. See *Justice* v. *Rose* (1957), 102 Ohio App. 482 [3 O.O.2d 39]. In that case, the court endorsed the general rule that the sheriff or jailer must exercise "reasonable care and diligence" to protect those in his custody from known or reasonably foreseeable dangers. The court found, however, that because the custodial officer had no reason to anticipate violence, there was no liability. *Justice* v. *Rose, supra,* at 484-485. In *Jenkins* v. *Krieger* (1981), 67 Ohio St. 2d 314 [21 O.O.3d 198], the Supreme Court approved this general rule of custodial negligence where the prisoner's injuries are proximately caused by the nonfeasance of the sheriff or subordinate custodial officers. See *id.* at 318-319.

### B

Whatever may be said about custodial negligence and the myriad cases which illustrate it, Ohio law certainly imposes no additional duty on custodial officers to ensure that *released* prisoners are absolutely free from any danger in any form. As the trial court suggested in this case, special relations do *not* extend *infinitely.* Here, the relationship terminated when Clemets was *free to leave,* which is currently the Fourth Amendment standard for scrutinizing police-citizen relationships and for determining when police have "seized" an individual. See, *e.g., United States* v. *Mendenhall* (1980), 446 U.S. 544; see, also, *State* v. *Hassey* (1983), 9 Ohio App. 3d 231.

In transporting Clemets back to his car, Heston was required to act only with ordinary care reasonable under the circumstances. This he did. Once released (*i.e.,* once Clemets was free to leave), any special relation between them ended. Heston thereafter owed no further duty to Clemets; their relationship to each other was no longer identifiable as "special" or "custodial." Without it, Heston owed him no affirmative obligation of care. Much like negligence "in the air," offended moral sensibilities alone simply will not suffice for purposes of liability.

### C

Under a broader *negligence* analysis, the officer had no duty to prevent that which he could not have reasonably foreseen, notwithstanding that the custodial relationship had terminated. *Justice* v. *Rose, supra,* at 485; cf. *Menifee* v. *Ohio Welding Products, Inc.* (1984), 15 Ohio St. 3d 75, 77 ("The existence of a duty depends on the foreseeability of the injury."). No circumstances or events forewarned Heston that Clemets was mentally disturbed, despondent or suicidal. Having had no knowledge or "reason to anticipate" that Clemets would take his life, Officer Heston cannot be said to have owed Clemets a duty of affirmative action to protect him against that possibility. *Jenkins* v. *Krieger, supra; Justice* v. *Rose, supra.* Consequently, since it was not reasonably foreseeable that, once released, Clemets would use the shotgun to commit suicide, no duty arose impelling Officer Heston to do more than he did.[10]

---

[10] Some contrary authority does exist in the "negligent release" context, but it appears to be distinguishable. See *Iglesias* v. *Wells* (Ind. App. 1982), 441 N.E. 2d 1017.

Accordingly, appellant's sole assignment of error is not well-taken.

On consideration whereof, the judgment of the Williams County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

CONNORS, P.J., and RESNICK, J., concur.

---

There, the court found that the sheriff knew the arrestee was incapacitated, due to his indigency and inability to speak English, but nevertheless released him, clad only in thin clothing, into bitterly frigid weather. This was tantamount to depriving the plaintiff of any protection whatsoever, which quite predictably led the court to hold:

"A sheriff has a duty not to release *incapacitated* prisoners under circumstances which will subject them to dangers *against which they are helpless to defend themselves.*" (Emphasis added.) *Iglesias v. Wells, supra,* at 1021.

In light of the court's specific holding, as emphasized, it is reasonable to assume that the court would treat differently the subsequent *suicide* of a released prisoner, who did not otherwise appear to custodial officers to be "incapacitated," since, *a fortiori,* knowingly killing oneself is a volitional act against which one is quite capable of protecting oneself. In addition to *Iglesias v. Wells, supra,* see, also, *Parvi v. Kingston* (1977), 41 N.Y. 2d 553, 394 N.Y.Supp. 2d 161, 362 N.E. 2d 960.