823 F.2d 553
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Gerald N. SCHAJATOVIC, Administrator of the Estate of Keith
G. Schajatovic, Deceased, Plaintiff-Appellee,
v.
The VILLAGE OF MAYFIELD; David H. Wheatcroft, Defendants-Appellants.
 No. 86-3417
 United States Court of Appeals, Sixth Circuit.
 July 15, 1987.
 
 Before KENNEDY, JONES and RYAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Gerald N. Schajatovic, Administrator of the estate of Keith G. Schajatovic, ('appellee') brought this action against the Village of Mayfield, Ohio, ('Village') and one of its police officers, David H. Wheatcroft ('appellants'). Keith Schajatovic ('decedent'), a seventeen-year-old, committed suicide using Officer Wheatcroft's gun. The suicide took place in the booking room of the Village police station where decedent had been taken after his arrest for driving under the influence of alcohol. At trial, appellee sought recovery for decedent's wrongful death and conscious pain and suffering, for deprivation of decedent's constitutional rights under section 1983, and for funeral expenses. At the close of appellee's case, the District Court granted appellants' motion for a directed verdict as to the section 1983 claim, but reserved ruling on all other claims until the close of all evidence. By agreement, the claim for conscious pain and suffering was not submitted to the jury. The jury returned a verdict for $654,506.65 in appellee's favor for wrongful death and funeral expenses. The court entered judgment on the verdict. Appellants moved for a directed verdict, a judgment notwithstanding the verdict, and for a new trial. These motions were denied. We affirm.
 
 
 2
 After decedent's arrest for driving under the influence of alcohol, he was handcuffed and transported to the police station. Decedent and Officer Griesmar, the arresting officer, entered the booking room and the handcuffs were removed. After being asked if he would like to telephone his parents, decedent stated that he would like to wait before making the call. Officer Griesmar testified that while waiting to make the call, decedent sat at a desk in the booking room and conversed with the officer. This officer also testified that he had received instructions on suicide profiles. These instructions provided that the officer should look for signs of depression or agitation, unusual feelings of guilt or similar emotional expressions. Officer Griesmar testified that decedent expressed none of these feelings but was cooperative and even joked at times.
 
 
 3
 Officer Griesmar placed decedent in the station's cell for a short time while he assisted Officer Wheatcroft in transporting the passengers in decedent's vehicle to the police station. Officer Griesmar testified that decedent expressed no concern about being left alone. After Officers Wheatcroft and Griesmar returned to the station, Officer Griesmar removed decedent from his cell. Officer Griesmar testified that decedent did not appear depressed and was cooperative in filling out the standard alcohol influence report form. Officer Wheatcroft, while making an inventory of the car at the station, got vomit from one of the young men in decedent's car on his uniform. He entered the booking room, removed his gun belt and shirt and placed them on a chair approximately ten feet from where decedent was sitting. Officer Wheatcroft testified that he placed his shirt over the gunbelt and that he thought another officer removed the gun from the booking room. This officer, however, misunderstood Wheatcroft and did not remove the gun before leaving the room.
 
 
 4
 Officer Wheatcroft then administered a breathalyzer test to decedent and found that the amount of alcohol in his blood exceeded 0.01%. Officer Wheatcroft testified that during this period decedent was cooperative and did not appear depressed. A short time later, all Village officers except Officer Wheatcroft responded to a call at a local tavern where a fight was in progress. While in the booking room with decedent, Officer Wheatcroft heard a Village officer radio the station for more help. Officer Wheatcroft left the booking room to determine whether another police department had been called for assistance. After Officer Wheatcroft left the room, decedent walked from the other side of the room and fatally shot himself using the gun that had been left on the chair.
 
 
 5
 Appellants stipulated that leaving the gun in the room was negligent and a violation of a Village regulation requiring all guns to be secured in a locker during the processing of arrested persons. Two experts testified that decedent's act was voluntary and intentional; there was no testimony that decedent was insane, or suffering from a mental disorder or disease. Dr. Danto, appellee's expert, testified that decedent's decision to commit suicide was an impulsive decision resulting from him being left alone in a room with a loaded gun. Decedent's family members and friends also testified that decedent was familiar with guns and never gave any indication of suicidal tendencies.
 
 I.
 
 6
 Appellants contend that under Ohio law, decedent's suicide was an intentional act precluding recovery for wrongful death based on appellants' negligence. Thus, appellants contend that the District Court erred in denying their motion for a directed verdict, judgment notwithstanding the verdict, and, alternatively, their motion for a new trial. This contention, however, is contrary to Ohio law. In Clemets v. Heston, 20 Ohio App. 3d 132, 485 N.E.2d 287 (1985), decedent was arrested for driving while intoxicated. He was taken to the police station, refused to take an intoxilyzer test, and released after receiving a citation. Although still apparently drunk, he returned to his car which contained a shotgun that he later used to commit suicide. His administratrix appealed the trial court's summary dismissal of her wrongful death action. The court of appeals agreed with the rule stated in section 314(A) of the Restatement (Second) of Torts, and concluded that a jailer owes a duty to those in his custody to keep them safe and protect them from harm. According to the court, 'The requisite standard of care is held to be that which is reasonable and ordinary for the health, care and well-being of the prisoner.' 20 Ohio App. 3d at 136, 485 N.E.2d at 292 (footnote omitted). The court, however, affirmed the dismissal of the case because at the time of the suicide, the decedent was not in police custody, and the court concluded that the police had no reason to anticipate that the decedent was mentally disturbed or suicidal. Thus, the District Court in the present case did not err in denying appellants' motion for a directed verdict, judgment notwithstanding the verdict, and for a new trial.
 
 II.
 
 7
 Appellants contend that the court erred in failing to give their requested instruction that if the jurors found decedent's act of committing suicide to be intentional, they should find no liability irrespective of appellants' negligence. Appellants fail to recognize that the court did give this instruction:
 
 
 8
 Ladies and gentlemen, in most situations, a death by suicide is not an actionable event because even though there may have been a tortuous conduct preceding the suicide, the suicide is ordinarily considered as an intentional act and not the result of a tort.
 
 
 9
 This relieves the original actor, in this case, David Wheatcroft of the liability. However, ladies and gentlemen of the jury, I instruct you that there is an exception to this general rule and this exception applies when the conduct of the defendants, in this case David Wheatcroft and Mayfield Village, cause a mental condition which results in an uncontrollable impulse leading to suicide. It is up to you to determine from the evidence whether the defendants in this case caused a mental condition resulting in such an uncontrollable impulse.
 
 
 10
 Record at 1118. Thus, the court gave the requested instruction including the recognized exception to the general no liability rule.
 
 III.
 
 11
 Appellants contend that the jury instructions were flawed in several other respects. First, appellants argue that the court erred in instructing the jury that under Ohio law appellants had a duty to exercise reasonable care to prevent the suicide and in failing to instruct the jury that if negligence principles apply, appellants would not be liable unless decedent's suicide was forseeable. Second, they contend that the court erred in instructing the jury regarding comparative negligence because decedent's act of committing suicide was an intentional act making the concept of comparative negligence inapplicable. Third, appellants argue that the court's instruction regarding the standard of care owed to decedent because of his age was erroneous because decedent was a minor over the age of fourteen. Finally, appellants contend that the court improperly instructed the jury as to its role in calculating damages.
 
 
 12
 An examination of the record in the present case reveals that appellants failed to make specific objections to the court's instructions with respect to these issues. Rule 51 of the Federal Rules of Civil Procedure provides in pertinent part:
 
 
 13
 No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.
 
 
 14
 This Court has recognized the mandatory nature of Rule 51, McDaniel v. Carroll, 457 F.2d 968, 969-70 (6th Cir. 1972); thus, we will not consider these alleged errors in the jury instructions.
 
 
 15
 Appellants also contend that the court erred in permitting appellee's expert, Dr. Danto, to testify regarding police standards and jail suicides. Appellants argue that although they stipulated that Dr. Danto was an expert in psychiatry, his qualifications as an expert in jail suicides and jail standards were disputed. Additionally, appellants contend that Dr. Danto failed to give answers in terms of reasonable medical (scientific) probability or certainty. Once again, however, an examination of the record reveals that appellants never specifically objected to Dr. Danto's qualifications in these areas or the certainty of his answers. Rule 103(a)(1) of the Federal Rules of Evidence provides:
 
 
 16
 (a) Effect of erroneous ruling
 
 
 17
 Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
 
 
 18
 (1) Objection
 
 
 19
 In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context . . ..
 
 
 20
 Accordingly, we will not consider appellants alleged errors with respect to Dr. Danto's testimony.
 
 IV.
 
 21
 Appellants' last contention is that the court erred in submitting to the jury The Minimum Standards for Jails in Ohio, Five Day Facility because there was no testimony that these standards applied to the Village's facility. The Five Day Standards apply to municipal jails choosing not to keep prisoners longer than 120 hours. Other standards apply to jails holding prisoners from zero to eight hours and longer than five days.
 
 
 22
 Police Chief Stevens testified that the Mayfield facility would confine prisoners anywhere from several minutes to slightly more than three days. Although Stevens testified that he did not know whether the standards were mandatory at the time of the suicide, he stated that he was aware of the standards at that time. Thus, the court did not error in submitting these standards to the jury.
 
 
 23
 Accordingly, the judgment of the District Court is affirmed.