On December 4, 1996, Raymond Mayville, an inmate at the London Correctional Institution ("LCI"), filed a complaint in the Court of Claims of Ohio against the Ohio Department of Rehabilitation and Correction ("DRC"). (The complaint was a re-filed complaint). Mr. Mayville was injured while helping repair a freight elevator located at LCI. Mr. Mayville averred DRC was negligent in failing to: provide a safe working environment; provide adequate supervision; maintain safety features on the elevator; maintain the elevator in a safe working condition; and train him in the maintenance of elevators.
The issues of liability and damages were bifurcated for trial and on May 1, 1998, a trial on liability was held. At the close of Mr. Mayville's case, DRC moved for dismissal pursuant to Civ.R. 41(B)(2). The trial court granted the motion. On May 6, 1998, an entry was journalized dismissing the case. Mr. Mayville then requested findings of facts and conclusions of law, which the trial court filed on June 1, 1998.
Mr. Mayville (hereinafter "appellant") has appealed to this court, assigning two errors for our consideration:
"ASSIGNMENT OF ERROR NO. 1:
 "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT SUSTAINED A MOTION TO DISMISS AT THE CONCLUSION OF PLAINTIFF-APPELLANT'S CASE.
"ASSIGNMENT OF ERROR NO. 2:
 "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DISMISSING PLAINTIFF-APPELLANT'S CASE BECAUSE SUCH RULING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
Appellant's assignments of error are interrelated and, therefore, will be addressed together. Essentially, appellant contends the evidence does not support the trial court's dismissal of the complaint at the close of appellant's evidence. In a trial to the court without a jury, a motion for judgment at the close of a plaintiff's case is a motion for dismissal pursuant to Civ.R. 41(B)(2). Johnson v. TanskySawmill Toyota, Inc. (1994), 95 Ohio App.3d 164, 167. Civ.R. 41(B)(2) states:
 "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant * * * may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52 if requested to do so by any party."
A dismissal pursuant to Civ.R. 41(B)(2) will not be set aside unless it is incorrect as a matter of law or is against the manifest weight of the evidence. Johnson at 167. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v.Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus.
The essential elements of a negligence claim are: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; and (3) such breach was the proximate cause of plaintiff's injuries. Chambers v. St. Mary's School (1998),82 Ohio St.3d 563, 565. In the context of prisoner cases, prison officials owe inmates a duty of reasonable care, but they are not insurers of inmates' safety. Williams v. Southern OhioCorrectional Facility (1990), 67 Ohio App.3d 517, 526. The standard of care is that which is reasonable and ordinary for the health, care and well-being of the prisoner. Clemets v.Heston (1985), 20 Ohio App.3d 132, 136.
Here, appellant was injured in the course of his employment at LCI. DRC (hereinafter "appellee") was under a duty to protect appellant against those unreasonable risks of physical harm associated with the performance of his duties. Boyle v.Ohio Dept. of Rehab. Corr. (1990), 70 Ohio App.3d 590, 592. Such duty includes the duty to exercise reasonable care to prevent inmates from being injured by dangerous conditions about which the state knows or should know. Moore v. Ohio Dept.of Rehab. Corr. (1993), 89 Ohio App.3d 107, 112; Dean v.Dept. of Rehab. Corr. (Sept. 24, 1998), Franklin App. No. 97API12-1614, unreported (1998 Opinions 4498, 4502).
Applying the legal principles above to the evidence adduced at trial, we conclude the trial court's decision was against the manifest weight of the evidence.
The evidence adduced at trial is as follows. Appellant was an inmate at LCI and worked in the brush factory as a machine operator sewing mops together. (Tr. 152, 154.) On the day in question, appellant and Basil H. Sturgill, another inmate, were working in the brush factory. Id. at 56-57, 154-155. Charles Heppard was the superintendent of the brush factory. Id. at 35-36. According to Mr. Heppard, he was informed by appellant and Mr. Sturgill that the elevator was not working. Id. at 44. Mr. Sturgill testified that it could have been him that discovered the problem with the elevator and informed Mr. Heppard of such problem. Id. at 78-80. Appellant testified that Mr. Heppard asked him to help repair the elevator. Id. at 154-155.
The elevator in question was a freight elevator that was used in the brush factory and serviced four floors including the basement. Id. at 12-13, 37. The estimated age of the elevator at the time of the incident was sixty-two years. Id. at 13, 50. Prior to the incident, the elevator had experienced various problems. Id. at 38. On the day in question, the elevator was not stopping even with the desired floor, a problem that had previously occurred. Id. at 38-39, 65. Mr. Sturgill and Mr. Heppard had worked on the elevator prior to the day in question. Id. at 65. Neither had had training on the maintenance or repair of elevators. Id. at 40-41, 65.
In order to repair the elevator, appellant was placed inside the elevator and was directed by Mr. Heppard on when to move the elevator. Id. at 48, 156-158. Mr. Heppard and Mr. Sturgill were located above the elevator shaft on a landing that contained the brake system. Id. at 44. The floor of the landing had a rectangular opening in it through which cables ran and through which one could look down inside the elevator car, the top of which is open. Id. at 46, 60-61. This allowed Mr. Heppard and Mr. Sturgill to yell down at appellant who was in the elevator car. Id. at 46-49, 59-61. Appellant had never helped Mr. Heppard with this type of work before. Id. at 171.
In order to make the elevator go up, appellant needed to apply constant pressure to the "up" button. Id. at 146. When one took a finger off the button, the elevator was supposed to stop immediately. Id. at 172, 174. The button was located on a control panel that was located just inside the elevator on the upper right-hand side (as one faces out). Defendant's Exhibit A-3, A-6. Hence, in order to operate the elevator, one had to stand in the front of the elevator. (Tr. 165.)
At the time of the incident, they had been working on the elevator for about twenty to thirty minutes and had raised and lowered the elevator twenty to thirty times or "so many times * * * [Mr. Sturgill lost] track." Id. at 59, 62, 157. The elevator was located between the second and third floors. Id.
at 158. Appellant described what happened as follows:
 " * * * Mr. Heppard yelled down to me. When I looked up to see what he wanted, my foot drifted over, and of course, not realizing that my foot drifted over, I just pushed the up button when he told me to bring it up, and my foot just got in between the second — between the third floor and the elevator." Id.
Appellant's left foot was caught between the elevator and third floor, causing his toes to be severed. Id.
This was the first time appellant had looked up. Id. at 159. Appellant looked up because Mr. Heppard yelled at him. Id. He then looked down at the button, pushed it and realized his foot had drifted over. Id. at 160. The elevator was about six inches from the third floor line, and it was "not long" or a matter of a second before his foot was caught. Id. at 171. Appellant stated he did not know his foot was over the edge at the moment he pushed the button. Id. at 173. He testified that he had no chance to pull it back and that had the elevator stopped when he let go of the button, there would have been enough time for him to pull his foot away. Id. at 173-174.
Appellant testified it was not complicated to operate the elevator. Id. at 161. He testified he was aware that he had to be looking at the bottom of the elevator in order to tell when to take his finger off the button. Id. at 162-163. Appellant knew that he had to watch the location of his feet and that his feet could get injured. Id. at 166, 170, 178-179. As to what had actually happened that day, appellant testified:
 "A. Well, at that moment — it seemed like Mr. Heppard was a little frustrated at the moment because he couldn't — couldn't get it adjusted right.
 "Q. Okay. But as I understand your testimony, you couldn't see Mr. Heppard; is that right?
 "A. No. All I could do was hear his voice, so I looked up, naturally, like you would.
 "Q. So there wasn't any visual cues you were looking for; they were audio cues, right?
"A. Not visual, no, just audio.
 "Q. So there was absolutely no reason for you to have to look up. Would you agree with that?
 "A. Well, sometimes he was standing over the hole and sometimes he wasn't, so it's just normally — just look up to see if he was there to give the right order.
 "Q. Well, I understand what you're telling me is what would be your tendency to do, but what I'm asking you is, was it necessary for you to look up to see — or necessary for you to look up at the top of the elevator when you — before you pressed that button, for the elevator to go up that day? That's what I'm asking.
"A. No, it wasn't necessary." (Tr. 167-168.)
Appellant stated that what happened was "just an accident," and he put the blame on no one. Id. at 168-169.
David O'Hara, an elevator mechanic, had worked on the elevator in question and testified that a layperson should not attempt to do the repair that was required here because there are "too many things you could get hurt on real quick if you don't know anything about them." Id. at 132-133. Mr. O'Hara stated that a person trained to do this kind of repair should perform the work. Id. at 135-136. He indicated that to do this job, you do not need someone actually in the elevator. Id. at 139. John T. Kravchuk, another elevator technician that had worked on the elevator, testified that an "elevator man" (as opposed to a layperson) should adjust the brakes when there is a "slide" problem. Id. at 105-107. When Mr. Kravchuk had adjusted the brakes on this elevator, he had someone inside the elevator helping him. Id. at 107-108.
The elevator was designed to have a safety gate on the front and at one point had such a gate. Id. at 182, 187-188. The purpose of such a gate is to keep passengers inside the car and to keep passengers from getting an appendage out where it might get cut off. Id. at 128.
There was no such safety gate on the elevator that day.Id. at 49-50, 67. Jessie Penix, an inmate who testified he had worked on the elevator and knew it from top to bottom, stated that Mr. Jago, his and Mr. Heppard's supervisor, was aware that there had been a safety gate on the elevator. Id. at 54, 181-182, 185. Mr. Penix stated that he did not know if such a safety gate was required to be in place but that common sense would tell you it would be required. Id. at 188-189.
In its findings of fact and conclusions of law, the trial court stated that as to appellant's claim that appellee failed to train him, appellee did not breach the duty of reasonable care. The trial court stated that operation of the elevator was simple, a reasonable person would understand how to properly and safely move the elevator, and appellant testified he knew how to operate it. The trial court also concluded that appellee's attempt to repair the elevator was not "the proximate cause" of appellant's injury. Finally, the trial court concluded that as to appellant's claim that appellee was negligent in failing to ensure the elevator had proper safety features, appellant failed to prove appellee was negligent in this regard. We find that the conclusions and judgment reached by the trial court are against the manifest weight of the evidence.
In L.W. Shoemaker, M.D., Inc. v. Connor (1992), 81 Ohio App.3d 748,752, this court found a trial court's Civ.R. 41(B)(2) dismissal to be unsupported by the evidence because there was no conflicting evidence with which the court could weigh and find against the plaintiff. This court pointed to the so-called "Alaska rule" which states that where a plaintiff has presented a prima facie case based upon unimpeached evidence, a trial court should not grant a Civ.R. 41(B) motion even if, as trier of fact, the trial court feels the plaintiff has not sustained his burden of proof. Id. at 753, quoting Rogge v.Weaver (Alaska 1962), 368 P.2d 810, 813. Here, while there was evidence upon which the trial court could have relied to find appellant's own conduct was a cause of his injury, there was other unimpeached evidence that made out a prima facie case of negligence.
Mr. O'Hara and Mr. Kravchuk testified that a layperson should not attempt to perform the repair that was necessary on this elevator. This testimony goes to duty, and there was no conflicting testimony. Appellee clearly breached this duty by having three untrained persons attempt to repair the elevator. As to proximate cause, appellant testified that had the elevator stopped when he took his finger off the button, he would have had time to pull his foot out of the way. The elevator, of course, was not working properly that day and continued to move even after one took the pressure off of the button. There was no conflicting evidence to appellant's testimony in this regard. Appellee had a duty to keep the elevator in a proper and safe working condition, and this duty had clearly been breached since the elevator was not stopping when it should have been.
The above constitutes a prima facie case of negligence. Such negligence consisted of appellee breaching its duty both by having a faulty elevator and having appellant assist in repairing it. The faulty elevator was a proximate cause of appellant's injury because had it not been "gliding," appellant could have gotten his foot out. Any evidence regarding appellant's awareness of the danger and of appellant's failure to keep his foot out of the way, or testimony that it was "just an accident" does not impeach the uncontradicted testimony that had the elevator been working properly, appellant would have had time to move his foot. At the most, such evidence would be relevant to a comparative negligence analysis which the trial court did not reach since it found appellee breached no duty.
For the reasons stated above, the trial court's judgment was against the manifest weight of the evidence. Accordingly, appellant's assignments of error are sustained.
Having sustained appellant's assignments of error, the judgment of the Court of Claims of Ohio is reversed, and this cause is remanded for a new trial.
Judgment reversed and cause remanded.
LAZARUS, P.J., and YOUNG, J., concur.
YOUNG, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.