OPINION
On July 26, 1998, plaintiff, Wiley Layne, an inmate at the Orient Correctional Institution, was walking toward dormitory 2E when an unidentified inmate struck him from behind knocking him to the ground. At the time of the assault, four correction officers were inside the dormitory: Officers Tresa Adams, Kristi Rippeth, Shane Sprauge, and Robert Scherer.
Officer Adams was responsible for monitoring the inside of the dormitory and was stationed at a desk which faced the interior of the common area. Officer Rippeth was also present and was speaking with Officer Adams prior to the beginning of her shift. Officer Sprauge was working that morning as one of the institution's "recreation officers" and was responsible for monitoring the indoor and outdoor recreation areas at the institution. Sprauge had come inside briefly to deliver a drink to Adams. Finally, Officer Scherer was also present and was assigned as a "1-2 float officer" that morning.
Although the incident occurred relatively close to one of the entrances to the dormitory, each of the officers testified that they did not see or hear the assault as their attention was focused on the activity inside the common area of the dorm. The officers also testified that they became aware of the attack when another inmate entered the dorm and advised them an altercation had occurred outside. Plaintiff was given immediate medical attention, while the area was searched for his assailant.
On September 24, 1998, plaintiff filed a complaint in the Court of Claims of Ohio against the Ohio Department of Rehabilitation and Correction ("ODRC") alleging that "[t]he guards were negligent committing dercliction [sic] of duty by not being on assigned posts." Plaintiff also accused the guards of sleeping and watching television.
In order for the plaintiff to prevail on his claim of negligence for the willful assault by another inmate, he must prove by a preponderance of the evidence that the defendant owed him a duty, that it breached that duty, and that the defendant's breach proximately caused his injuries. Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 285; and Williams v. Southern Ohio Correctional Facility (1990), 67 Ohio App.3d 517.
While the defendant owes a duty of reasonable care to inmates to provide for their care and well being, it is not an insurer of inmate safety. Clemets v. Heston (1985), 20 Ohio App.3d 132; and Williams, supra, at 526. Thus, the dispositive issue before the trial court for decision included whether the defendant breached its duty of care, and whether that breach, if any, proximately caused the plaintiff's injuries.
At trial, plaintiff endeavored to establish that he was marked for assault because he had been labeled a "snitch" by other inmates. Plaintiff claims that, prior to the assault, he reported to William Bates, the coordinator of food services, that he had seen another inmate with a cellular phone. That person was inmate Roach. As a result of this report, Roach was disciplined. The investigation into the plaintiff's report also revealed that Roach had received the phone from a correctional officer with whom he had an affair. That officer was subsequently dismissed.
The defendant is not liable for the intentional attack of one inmate by another, unless it has actual or constructive knowledge of an impending assault. See Baker v. State (1986), 28 Ohio App.3d 99; and Williams, supra. Therefore, the issues before the trial court were whether the defendant had knowledge of an imminent assault, and whether the defendant's alleged failure to act proximately caused the plaintiff's injuries.
After trial, the court concluded that the plaintiff had spoken with Sergeant Thomas Jones of the ODRC approximately three months prior to the assault. The court also concluded that Jones had offered to transfer the plaintiff to another dorm for his protection, but that the plaintiff refused to be transferred. Plaintiff was also informed that he could write an anonymous "kite" documenting the facts or encounters which led him to fear for his safety, or that he could also write a confidential statement which would document the situation, and which would be forwarded for further evaluation and investigation. However, plaintiff flatly refused each option.
Finally, the court found that the plaintiff admitted that he had heard only rumor, and had received no direct threats. The plaintiff also was in no fear of imminent attack and had otherwise refused to give Sergeant Jones any names. Based upon the evidence and testimony, the court concluded that the plaintiff had failed to establish the defendant's negligence. Plaintiff now raises the following seven assignments of error:
 [1.] THE TRIAL COURT AND THE MAGISTRATE ERRED AND ABUSED THEIR DISCRETION IN FINDING THE INSTITUTION WAS NOT GUILTY OF NEGLIGENCE IN PROTECTING AN INMATE THAT WAS BRANDED A SNITCH.
 [2.] THE TRIAL COURT AND THE MAGISTRATE ERRED AND ABUSED THEIR DISCRETION IN FINDING THE DEFENDANT-APPELLEE DID NOT HAVE NOTICE OF DANGER OF AN ATTACK ON PLAINTIFF-APPELLANT.
 [3.] THE TRIAL COURT AND THE MAGISTRATE ERRED AND ABUSED THEIR DISCRETION IN FAILING TO FIND LACK OF SECURITY ON THE YARD WAS NOT A DIRECT AND PROXIMATE CAUSE OF PLAINTIFF-APPELLANT'S INJURY.
 [4.] THE TRIAL COURT AND THE MAGISTRATE ERRED AND ABUSED THEIR DISCRETION IN FINDING PLAINTIFF-APPELLANT DID NOTHING TO PROTECT HIMSELF.
 [5.] THE TRIAL COURT AND THE MAGISTRATE ERRED AND ABUSED THEIR DISCRETION IN FINDING LAYNE WAS SURPRISED AS GROUNDS FOR DISALLOWING THE ACTION FOR RELIEF.
 [6.] THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW.
 [7.] THE TRIAL COURT ERRONEOUSLY RULED ON THE OBJECTIONS WITHOUT DEALING WITH THEM INDIVIDUALLY AND REVIEWING THE RECORD DE NOVO AS REQURIED BY RULE 53(e)(4)(B), Ohio Rules of Civil Procedure.
Although plaintiff's first six assignments of error each present separate instances of alleged error, they are all based upon plaintiff's claim that the trial court's verdict stands against the weight of the evidence presented at trial.
"When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." State v. Thompkins (1997), 78 Ohio St.3d 380, 386-387. According to the Ohio Supreme Court, the "manifest weight" of the evidence is:
 * * * the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. [Id. at 387; emphasis sic.]
Accordingly, the appellate court must examine the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way, and whether it created such a manifest miscarriage of justice that its judgment must be reversed. Accordingly, we will review the testimony and evidence presented by each party.
Eight witnesses were called during trial. Those witnesses were the plaintiff, William Bates, Officers Rippeth, Adams, Sprauge, and Scherer, inmate Stacy Clemmons, and Sergeant Jones.
The first witness called was William Bates. Bates testified that he was employed as a food service supervisor at the Orient Correctional Institution for approximately eleven years. Bates recounted that prior to the assault, plaintiff told him that he had seen inmate Roach with a cellular phone. Bates testified that he reported this conversation to Officer Chris Maienza, who asked that he also submit a report regarding the conversation. Bates' direct knowledge and involvement in the situation ended with his report to Officer Maienza. However, he did acknowledge receiving second-hand reports that inmate Roach had been questioned and searched, and that a cellular phone had been found in his possession. He also heard that the investigation had revealed that Roach was having an affair with a correction officer, and that the officer had been dismissed.
The second witness was Officer Rippeth. Rippeth testified that, on the morning of July 26, 1998, she was paying a visit to Officer Adams prior to the beginning of her shift as a "Library Officer." According to Rippeth, dormitory 2E is very large and houses approximately one hundred ninety inmates. While only one officer is normally assigned to supervise the dormitory on first shift, Rippeth testified that Officers Sprauge and Scherer were also present. All four officers were situated on a large interior platform overlooking the common area of the dormitory. The outside doors and windows were secured, and Adams was on post supervising the interior. Scherer was assigned as a 1-2 float officer, and was responsible for moving between dormitory 1 and 2E in order to keep an eye on the safety of the stationary officers.
Officer Rippeth explained that the exterior windows were obscured by bars and screens and were difficult to look through. She also explained that she did not know the plaintiff, had no knowledge of his claim that he had been labled a snitch, or that he had been marked for assault.
The third individual to testify was Officer Adams. Adams explained that the assault occurred just prior to the closing of the outdoor recreation yard at 10 a.m. Adams' testimony paralleled that of Officer Rippeth regarding the positions and the persons present that morning. She recounted that the officers became aware of the assault when another inmate entered the building and informed them that the plaintiff had been beaten. However, prior to the incident, none of the officers had seen or heard any activity in the recreation yard. In her own words, "[t]he dorm is very loud. You can hardly hear yourself talking in a dorm." (Tr. 44.) Adams also clarified the responsibility of the 1-2 float officer, explaining that the officer, by definition, is mobile and moves between the interior and exterior of dormitories 1 and 2E.
The fourth person to testify was Officer Sprauge. Sprauge was one of the assigned recreation officers that morning. Although he was inside at the time, Sprauge had come in from the yard in front of 2E only five to ten minutes prior to the assault. He also explained that no one was in a position to hear or see the yard from Adams' post, but that there are commonly other recreation and "yard officers" about the grounds. Sprauge stated that on a given shift there are normally two recreation officers, in addition to "floats." The recreation officers monitor the indoor and outdoor facilities, while the yard officers are responsible for walking the fenced perimeter. As noted, the float officers move between the interior and exterior of their assigned dormitories.
After the assault, Officer Sprauge assisted plaintiff and walked with him to get medical attention. Although he questioned plaintiff about the assault, Sprauge explained that plaintiff refused to give him any information. He also stated that he had no knowledge of the plaintiff, or the plaintiff's claim that he had been labeled a snitch.
Officer Scherer was the fifth person to testify and was the assigned 1-2 float officer that morning. Scherer explained that a float officer is responsible for keeping an eye on their assigned dormitories. This includes both the exterior, as well as the interior, of those buildings. At the time of the assault, he was with the others, and was observing the interior of 2E with Officer Adams.
Officer Scherer testified that he had been in and out of dormitory 2E several times that morning, and had been inside with the others for approximately twenty minutes prior to the assault. He also explained that it was part of his duty to check the interior as well as the exterior areas, and that while inside, his primary responsibility was to ensure the safety of, in this case, Officer Adams. He was also responsible for ensuring that there was no prohibited activity occurring in the "day rooms" or the bathrooms, and for being available to assist in emergencies or other routine matters.
Officer Scherer explained that he and Officer Sprauge left the building upon being told of the disturbance involving the plaintiff. While Sprauge stopped to assist the plaintiff, Scherer ran out and around the building in an attempt to locate and apprehend plaintiff's assailant. Unfortunately, Sprauge spotted no one. Sprauge then questioned another officer who was stationed approximately seventy feet from the incident, but this officer did not witness the assault, nor did he observe anyone pass his way. Scherer questioned three or four inmates who had arrived on the scene, but was only able to get the description of a "stocky-built" inmate who had his face and exposed skin covered by clothing. Finally, Scherer testified that he did not know the plaintiff, nor of any rumor that he was in danger.
The next person to testify was inmate Stacy Clemmons. Clemmons explained that he rose from bed and looked out of his first floor dormitory window when he observed the plaintiff and another inmate fighting. However, by the time he made his way to the exterior door, the fight was over, and the plaintiff lay on the ground. Clemmons also stated that he had heard no rumor about the plaintiff's safety, and explained that only in very rare cases is an inmate in actual danger after being labeled a snitch.
The seventh witness was Sergeant Jones. In 1998, Jones worked as a "Correctional Counselor" in dormitory 2E. Jones testified that the plaintiff had come to him and stated that there were rumors circulating that he had been an informant against inmate Roach. According to Jones, plaintiff stated that the rumors were actually writings on a bathroom wall.
Upon listening to the plaintiff, Sergeant Jones offered several available courses of action. First, Jones offered to have the plaintiff transferred to another dormitory, however, the plaintiff refused. Jones also explained to the plaintiff that he could write a confidential statement, which he also refused to do. Finally, Jones told the plaintiff that he could write an anonymous "kite"; however, plaintiff refused this option as well.
Importantly, Sergeant Jones testified that the plaintiff at no time informed him of an impending assault, or of the plaintiff's belief that an impending assault was about to occur. When asked whether the plaintiff gave him any specific information at all, Jones stated: "No, sir. All he told me was that he had heard rumors that he was going to get assaulted because of a situation with the inmate and the staff member." (Tr. 82.)
The plaintiff was the last person to take the stand. During the course of his testimony, plaintiff accused Officers Adams, Sprauge, Scherer, and Rippeth of sleeping on the job and of watching television. He claims that, prior to the assault, he took a seat at a table in the outdoor recreation area where he talked with other inmates. Wanting a cup of coffee, plaintiff explained that he went inside, used the restroom, and returned to the recreation area where he stayed until the area closed. At that point, he walked back toward the dormitory where he was assaulted. According to the plaintiff, at no time were there any officers in the yard or watching over the dormitory.
During the course of his testimony, plaintiff explained that he had talked with William Bates, and then Sergeant Jones regarding his report that inmate Roach had a cell phone. Plaintiff claims that he informed Bates and Jones that someone had written "snitch" on a bathroom wall. He also claims to have been told by unnamed inmates that there was a rumor going around that he was a snitch. As for his conversation with Sergeant Jones, plaintiff claims that he explained the entire situation, at which time Jones told him, "Don't worry. I'll take care of it." (Tr. 91.) Plaintiff also claims to have given Jones the names of inmates Fry and Bland, who Jones promised to speak with. According to the plaintiff, this conversation occurred three months prior to the assault.
On cross-examination, plaintiff admitted that he was never directly threatened; that he refused to pursue available options such as complaints, anonymous or otherwise; that he refused to be transferred; that he did not file a grievance until after he filed this action; that he did not ask Sergeant Jones for protection; and that he, in fact, did not expect or anticipate being assaulted that morning. Finally, despite his claim that he had spoken with Bates and Jones about inmate Roach and the phone, he admitted that on October 25, 1998, he filed a grievance wherein he denied those conversations stating: "I never knew anything about the phone Marsha gave Roach and I am not the one who informed on them." (Tr. 103-104.)
After considering all of the testimony and evidence, we are unable to find that the court lost its way or created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered. As we explained in Williams, supra, a similar negligence suit based upon an assault on an inmate by another inmate, "[t]o establish a breach of duty, appellant must show that the actions giving rise to his injuries were foreseeable by prison officials." Id. at 526. In that case, the plaintiff also admitted, as did the plaintiff here, that the assault was a surprise. (Tr. 98-99.) Based upon that admission, we noted "[a]ppellant himself admits that [the] attack was a surprise. If it was a surprise to him, how could it be foreseeable to prison officials?" Id.
The plaintiff also clearly has a responsibility to exercise reasonable care to protect himself and that responsibility, at a minimum, encompasses a duty to cooperate with prison officials. As noted, however, the plaintiff refused to take advantage or pursue any of the options offered by the defendant to ensure his safety. Moreover, other than inferring that the officers were negligent because they happened to be in close proximity at the time of the assault, yet were unable to anticipate or prevent it, plaintiff failed to present any evidence that the officers in dormitory 2E that morning were in violation of any regulation, policy or procedure, or that their presence was otherwise inherently abnormal. Indeed, there was testimony that the guards followed their normal procedure on the day that the plaintiff was assaulted. See Baker, supra.
When there is competent, credible evidence supporting a trial court's decision, an appellate court will not overturn that decision based upon a manifest weight argument. C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279. Having carefully conducted an independent review of the evidence and testimony presented, we are unable to find that the trial court lost its way, or that its verdict stands against the weight of the evidence. Accordingly, we overrule the plaintiff's first, second, third, fourth, fifth, and sixth assignments of error.
In his seventh assignment of error, plaintiff claims that the trial court erred when it failed to individually address each of the plaintiff's objections to the report and recommendation of the court's magistrate. Civ.R. 53(E)(4)(b) provides:
 The court shall rule on any objections. The court may adopt, reject, or modify the magistrate's decision, hear additional evidence, recommit the matter to the magistrate with instructions, or hear the matter. * * *
While a better practice would be to individually itemize and address objections separately, and while we have no quarrel with the plaintiff's citation to case law holding that a trial court must act independently when determining whether or not to adopt a magistrate's decision, in this case, plaintiff produces only accusation and no substantive evidence in support of his claim that the court did not exercise its own judgment. On the other hand, the trial court explicitly stated that it had reviewed the record, the magistrate's decision, and the plaintiff's objections. Plaintiff's seventh assignment of error is therefore overruled.
Having overruled all seven of plaintiff's assignments of error, we hereby affirm the judgment of the Court of Claims of Ohio.
 __________________ PETREE, J.
TYACK and BROWN, JJ., concur.