THOMAS, Admr., Appellant,

v.

City of PARMA et al., Appellees.

[Cite as *Thomas v. Parma* (1993), 88 Ohio App.3d 523.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 63014.

Decided July 6, 1993.

524

*Robert J. Vecchio Co., L.P.A., Robert J. Vecchio* and *Anthony J. Vegh,* for appellant.

*Christopher A. Boyko,* Law Director, *Timothy G. Dobeck, Rodger A. Pelagalli* and *Anthony J. Zampedro,* Assistant Law Directors, for appellees.

HARPER, Judge.

Plaintiff-appellant, Darlene J. Thomas, as Administrator of the Estate of George Robert Thomas, appeals from an order of the Court of Common Pleas of Cuyahoga County granting summary judgment in favor of defendants-appellees, the city of Parma and its police chief, Francis Szabo (collectively "appellees"). A careful review of the record compels affirmance.

George Thomas ("the decedent") was convicted in Parma Municipal Court on September 6, 1990 of driving under the influence of alcohol, driving under suspension, and fleeing and eluding. The trial court subsequently sentenced him to a term of one year and three months in the Cuyahoga County Jail.

The decedent reported to the Parma Municipal Jail on October 31, 1990 at 4:00 p.m. to begin serving his sentence. Patrolmen Michael Klein and Brian McCann were on duty at the time as desk officer and assistant desk officer, respectively.

The officers initiated the booking process, which involved interviewing and observing decedent in addition to completing a "Receiving Screening Form." The process was complete forty minutes later.

Klein then escorted the decedent to his cell at approximately 4:40 p.m. The decedent was given a mattress and water and he declined Klein's offer to bring him anything else. Klein, in his affidavit, averred that the decedent was left in the cell, "sitting in the upper bunk in his cell looking around, appearing calm and otherwise acting normal."

McCann, at about 4:48 p.m., conducted a check of the prisoners. According to him, the decedent was found hanging by his shoelaces from the door of his cell.[1] McCann alerted the station house and personnel began resuscitation efforts on decedent.

The decedent was later transported to Parma Community General Hospital by emergency medical service personnel. He failed to respond to treatment and was pronounced dead on November 2, 1990 at 10:44 a.m.

Appellant brought this wrongful death and survival action against the defen-

---

1. A "History and Physical Report" issued by Parma Community General Hospital in early November 1990 provides: " * * * later the police stated that they found him in his jail cell with his shoelaces tied around his neck in a kneeling position. The police stated that the laces were very tight around his neck * * *." Further explanation is found in the "Coroner's Verdict": "Investigation determined that this man had suspended himself with a shoelace tied to a top cell bar. The shoelace then broke and the said George Robert Thomas collapsed to the floor with part of the shoelace still secured around his neck."

dants on March 11, 1991 pursuant to R.C. 2125.01 and 2305.21.[2] She alleged in her complaint that the appellees' acts and/or omissions constituted negligence, gross negligence, recklessness and/or willful or wanton misconduct. As a result, the appellees failed to exercise reasonable care for decedent's safety by, among other things, not removing his shoelaces, since he was acutely intoxicated when he reported to the jail. Further, appellant alleged that the decedent sustained bodily injuries together with pain and suffering as well.

Appellees responded to appellant's allegations by filing, in addition to their answer, a motion for summary judgment on September 24, 1991. Appellant filed a brief in opposition to this motion on October 29, 1991. The trial court granted summary judgment in favor of appellees on December 5, 1991, without opinion.

It is from this adverse ruling that appellant now appeals, raising error as follows:

"The trial court erred, as a matter of law, in granting appellees' summary judgment [motion]."

Appellant relies heavily on our prior decision in *Payne v. Newburgh Hts.* (Apr. 11, 1991), Cuyahoga App. No. 58380, unreported, 1991 WL 53898, in maintaining that the trial court erred in summarily disposing of her wrongful death and survival action. Specifically, she focuses on the fact that hospital records reveal that the decedent was "acutely intoxicated"[3] when he reported to the jail; therefore, "genuine issues of material fact exist which show that [decedent's] suicide was foreseeable and that Appellees breached their duty of care to [him]."

The granting of summary judgment is appropriate only if there is no genuine issue as to any material fact, and reasonable minds can come to but one conclusion which is adverse to the nonmoving party. *Toledo's Great E. Shoppers City, Inc. v. Abde's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St.3d 198, 201, 24 OBR 426, 428–429, 494 N.E.2d 1101, 1103–1104; Civ.R. 56(C). An order granting summary judgment will, therefore, only be upheld where the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law when construing the evidence most strongly in favor of the nonmoving party. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 273–274. In reviewing the granting of summary judgment, an appellate court must apply the same standard as the trial court. *Id.*

---

2. Distinct causes of action are created by R.C. 2125.01 and 2305.21, which are meant to accomplish different statutory purposes although triggered by an individual's death.

3. The decedent's blood alcohol content was reported as .217 by hospital personnel when he was brought to the hospital.

■ A plaintiff, in order to maintain a wrongful death action on a theory of negligence, must show three elements. First, there must be a duty owed to plaintiff's decedent. Second, there must be a breach of that duty. Third, there must be proximate causation between the breach of duty and the death. *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92, 529 N.E.2d 449, 454–455, citing *Bennison v. Stillpass Transit Co.* (1966), 5 Ohio St.2d 122, 34 O.O.2d 254, 214 N.E.2d 213, paragraph one of the syllabus.

■ The existence of a duty is in the first instance a question of law for the trial court even though negligence actions involve both questions of law and fact. *Clemets v. Heston* (1985), 20 Ohio App.3d 132, 20 OBR 166, 485 N.E.2d 287. Under Ohio law, the existence of a duty depends on the injury's foreseeability. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 180–181, 472 N.E.2d 707, 710. "The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. [Citations omitted]." *Id.* The foreseeability of harm generally depends on a defendant's knowledge. *Thompson v. Ohio Fuel Gas Co.* (1967), 9 Ohio St.2d 116, 38 O.O.2d 294, 224 N.E.2d 131.

The issue of whether a defendant should have recognized the risks involved focuses on only those circumstances perceived by the defendant or those that should have been perceived at the time of the defendant's actions. There is no issue to submit to the jury if the evidence does not identify specific conduct which involved an unreasonable risk. *Englehardt v. Philipps* (1939), 136 Ohio St. 73, 15 O.O. 581, 23 N.E.2d 829.

■ The common-law duty owed to an arrestee or prisoner by a law enforcement officer is found in *Clemets,* 20 Ohio App.3d at 136, 20 OBR at 169–170, 485 N.E.2d at 292:

"The general 'custodial negligence' rule is that a jailer (or other custodial personnel, such as a sheriff or arresting officer) owes a duty to those in his custody to keep them safe and protect them from harm. The requisite standard of care is held to be that which is reasonable and ordinary for the health, care and well-being of the prisoner."

■ Finally, the general rule is that suicide is an intervening force that breaks the causal connection from the wrongful act to the result. *Fischer v. Morales* (1987), 38 Ohio App.3d 110, 112, 526 N.E.2d 1098, 1101. However, the defendant remains liable if the intervening force could have been easily foreseen by the defendant. *Id.*

▉ In the present case, as stated above, appellant primarily focuses on the decedent's state of intoxication in arguing that the officers failed to adequately guard against his foreseeable suicide. She argues that once the officers were aware of his intoxicated state, which, considering its intensity, the officers could not have possibly not known about, they were required to remove decedent's shoelaces and observe him. Appellant supports her position with several training materials given to city officers.

First, in July 1984, nine police officers [4] were directed to read an "Executive Summary" distributed by the National Center on Institutions and Alternatives. The summary addressed the subject of jail suicides and initially described characteristics appearing most often in jail suicide victims. It then presented the following relevant statistics: nearly sixty percent of the victims were under the influence of alcohol and/or drugs at the time of incarceration; two out of three inmates who commit suicide are held in isolation; fifty percent of the victims are dead within the first twenty-four hours of incarceration with twenty-seven percent occurring in the first three hours; and over eighty-eight percent of inmates under the influence of alcohol and/or drugs at the time of incarceration committed suicide within the first forty-eight hours of confinement, with a majority being found dead within the first three hours of confinement.

The summary then went on to suggest recommendations to jailers and other public officials as to how they might prevent jail suicides. Regarding jailers, they should be aware of the characteristics of a suicide victim profile, said profile being a young white, single male, under the influence of alcohol, and placed in isolation. In addition to recommending surveillance, and human interaction, the summary cautioned that "[t]he state of intoxication of a person under incarceration greatly increases the likelihood of a suicide. The jailer who admits an intoxicated individual into his facility is inviting trouble."

Second, in a training publication entitled "Identifying the Suicide Risk in Police Lockups," police officers were instructed as to the signs and symptoms of potential suicide victims. Thus, they were told that a number of events or situations, under the right conditions, may cause an individual to be more inclined to commit suicide. Recent excessive drinking was designated as a leading predisposing factor because of alcohol's depressing effect. If alcohol consumption is a factor, the writing commented:

"The *most crucial time* is during the first 24–hours of incarceration, specifically the first three hours. For the intoxicated inmate, severe depression may set in when he begins to sober up. Heavily intoxicated persons should always be

---

4. Neither Officer Klein nor Officer McCann was listed on this document as officers who were directed to read the "Executive Summary."

watched closely because of the possibility that they may unintentionally injure themselves or asphyxiate themselves on their vomitus. * * *" (Emphasis *sic.*)

Further, in addition to conducting screening for potential suicide victims, the writing recommended that written clearance be sought from a physician if the prisoner showed signs of alcohol abuse, listed as blood-alcohol content above .27.

In a second training publication, entitled "Managing the Suicide Risk in Police Lockups," police officers were instructed on the course of action to be taken if the prisoner is viewed as a suicide risk after screening. If the prisoner is to be held in lockup versus being transferred to a mental health facility, it is recommended that "all means should be taken to ensure that he will not harm himself or others," including the removal of his belt, tie, shoelaces and suspenders. The prisoner should then be confined to a suicide-resistant, protrusion-free cell.

Appellant herein asserts that the appellees' position that they did not know or had no reason to know of the decedent's potential to commit suicide prior to his incarceration is erroneous. She, therefore, argues that the appellees' knowledge of decedent's alleged suicidal state and their failure to comply with the recommendations set forth in the training materials were issues solely for the determination of the trier of fact.

All of the training materials submitted to the court by the appellant emphasize that an intoxicated prisoner is most vulnerable to committing suicide. The materials proceed with steps to be taken by prison authorities to prevent suicides from occurring in their jails. These steps include screening the prisoner for suicidal thoughts by observing his behavior and questioning him. Once the prisoner is believed to be suicidal based on this observation and questioning, other additional steps should be taken, *e.g.*, continual observation once in the cell and even alternative incarceration arrangements.

The appellees herein submitted affidavits of Officers Klein and McCann to the trial court along with their motion for summary judgment. Therein, both officers averred that they interviewed and observed the decedent while booking him into the jail, a process which took approximately forty minutes. Both officers further stated that at no time during the booking did the conduct of decedent or any other information available to the officers "appear to indicate that [he] posed a threat of suicide or self-injury or that he was anything other than a normal prisoner." The only unusual conduct mentioned by the officers was that the decedent claimed he was told he would be immediately transferred to the Cuyahoga County Workhouse to serve his sentence. The officers investigated this claim but learned that the decedent would have to wait for admittance to the workhouse. The decedent at this point replied that he would sue if he was forced to spend more than three days in the city jail.

In addition, the officers completed the "Receiving Screening Form." There was no notation with regard to the decedent's alcoholic state, as they responded "no" to the following questions:

"6. Does the inmate appear to be under the influence of alcohol?

"7. Does the inmate appear to be under the influence of barbituates [sic] heroin or any other drugs?

"8. Are there any visible signs of alcohol/drug withdrawal symptoms?"

Finally, when Officer Klein escorted the decedent to his cell, Klein left him there after giving him a mattress and water. The decedent was sitting on the upper bunk and appeared to be calm and otherwise acting normal. The decedent declined the officer's offer to bring him anything else. It was only several minutes later that Officer McCann checked the prisoners and found the decedent with the shoelaces around his neck.

As stated above, appellant relies heavily on our previous decision in *Payne*. In that case, this court reversed the trial court's granting of summary judgment in favor of the city of Newburgh Heights on the plaintiff's claim that her decedent's death was caused by the city's wanton and willful conduct of ignoring the decedent's suicidal disposition.[5] *Payne*, however, presents a distinctively different factual scenario than the instant case.

The plaintiff in *Payne* contacted the police station after a domestic dispute. When officers arrived at her home, she informed them that her husband, the decedent, threatened to commit suicide by jumping off a bridge. She and her son were taken to the police station where the decedent arrived later, demanding that he see his family. The officers subsequently arrested him for disorderly conduct and intoxication.

The plaintiff left the station and requested that close attention be given to the decedent. One of the officers promised that he would do so. The plaintiff also informed another officer of the decedent's threat of suicide. She intermittently telephoned the station between 8:00 p.m. and 11:00 p.m., requesting once again that the officers check her husband. She specifically recalled telling the dispatcher at 10:00 p.m. of the decedent's earlier suicide threat and it was at 11:00 p.m. when she telephoned the station again that a check was made of decedent. It was too late, as the decedent was found hanging by his socks from the cell door.

---

5. We likewise found that the trial court erred in granting summary judgment in favor of defendants if it did so based on a negligence theory. However, we ruled that the defendants were immune to a negligence claim pursuant to R.C. Chapter 2744.

The *Payne* case dealt with the situation where the officers in the jail were specifically informed of the decedent's threat to commit suicide. The record revealed that the officers, even though aware of the specific threat, discounted the threat because it was "common during domestic disputes." The officers were further alerted to the decedent's mood swings and were aware of his intoxicated state. Nevertheless, the decedent was placed in a cell in the basement of the station, a cell from which he could not be observed unless he was sitting with his arms or legs outside the cell door. The decedent could not be heard either, as the audio system in the cell was affected by traffic outside. Finally, even though the plaintiff continually requested that checks of her husband take place, none was until it was too late.

In contrast, a review of the officers' conduct and the record herein fails to demonstrate that the trial court erred in granting summary judgment in favor of appellees on appellant's wrongful death claim and consequently on the survival claim. Initially, we recognize that the officers' failure to identify the decedent's alcoholic state is questionable in light of the fact that officers are trained to recognize such states not only for booking offenders but for spotting them on public roads, etc. However, the fact that the decedent was legally drunk when taken to the hospital over an hour after his arrival at the station does not alter our opinion that the officers did not breach any duty owed to the decedent. We find no evidence in the record that the officers had any reason to believe that the decedent posed a risk of suicide. Since the suicide was not foreseeable, we view it as an intervening force for which appellees cannot be held responsible. *Menifee; Englehardt; Fischer; Payne.*

Appellant's assignment of error is thus overruled.

*Judgment affirmed.*

BLACKMON, P.J., and NUGENT, J., concur.