OPINION
This is an appeal from the Lake County Court of Common Pleas. Appellants, Mary Jane Cole, Steve Kopaitich ("Steve"), and Lillian Kopaitich ("Lillian"), appeal the judgment entry of the Lake County Court of Common Pleas granting summary judgment in favor of appellees, Pine Ridge Apartments Company II ("Pine Ridge"), Goldberg Companies, Inc. ("Goldberg"), DRP Security, Inc. ("DRP"), David I. Morris ("Morris"), Hermann Hill ("Hill"), Demetrious Latham ("Latham"), Willo Security, Inc. ("Willo"), and Wayne Trubiano ("Trubiano").
Appellants filed a complaint against appellees on January 15, 1997. This action arose from the murder of JoAnne C. Kopaitich ("JoAnne") by Michael Aquilla ("Aquilla") at the Pine Ridge Apartment Complex in August 1995. The action was for wrongful death and survivorship, funeral and burial expenses, punitive damages, and intentional/negligent infliction of emotional distress against Pine Ridge, the owner of the apartment complex located in Willoughby, Ohio; Goldberg, the provider of management services to the apartment complex; Morris d.b.a. DRP, the provider of security services to the apartment complex; Hill and Latham, the security guards on duty at the apartment complex; and Aquilla.[1] On August 13, 1997, appellants filed an amended complaint and joined Trubiano d.b.a. Willo Security, another provider of security for the apartment complex.
This matter arose out of a trespass, breaking and entering, assault, and stabbing that occurred on August 17, 1995. The victim, JoAnne, resided at the apartment with her parents, Steve and Lillian. According to JoAnne's father, Steve, he leased the apartment from Pine Ridge on July 9, 1987, and JoAnne moved in in 1994. At 4:09 a.m., on August 17, 1995, JoAnne telephoned 9-1-1 to report that she was bleeding.
In an affidavit, Aquilla stated that he had entered the apartment complex at approximately 2:30 a.m. He "was looking in car windows for speakers and other items to steal." He averred that he "spent thirty minutes walking around and looking into cars and then proceeded to the area near [Steve and Lillian's] apartment because it was dark." Aquilla tried to gain access into the apartment through the main entrance, but he was unsuccessful. He then attempted a window entry for about thirty minutes. Finally, Aquilla cut and opened the screen and entered the apartment through a sliding glass door located on the ground-level balcony. Aquilla explained that he forced the sliding glass door open with his knife, which took about five minutes.
In his deposition, Steve testified that "[n]obody ever complained about security, but [he] complained an awful lot about the dark corner [on their patio]." He had requested installing a security light to one of the janitors. The janitors told Steve that they could not install a light unless management instructed them to do so. However, he admitted that he "never made the request [to anyone else], but [he] talked about it to other people * * *." Furthermore, Steve averred that there was piece of wood that was in the apartment when they moved in that was to be used to secure the glass sliding door from the inside, but they did not use it because it was "about six inches shorter than it should have been." He explained that he did not put anything else down because he "didn't feel he needed to do that * * *" because there was security.
The apartment building was limited to residents, and guests entered via an intercom/buzzer system. Goldberg had hired DRP to provide security. Specifically, Morris, the president of DRP, provided information to Goldberg regarding effective security measures.
Hill and Latham, who were employed by DRP, were the two security guards on duty during the early morning hours of August 17, 1995. The procedures of DRP called for one of the guards on duty to remain at the gatehouse, while the other guard was to perform foot patrol of the buildings in the apartment complex in the following intervals: 8 p.m. to 10 p.m.; 10 p.m. to midnight; midnight to 2 a.m.; 2 a.m. to 4 a.m.
In the early morning hours of August 17, 1995, Latham, the guard that was to perform the rounds during the 2 a.m. to 4 a.m. shift, did not complete his rounds. In Latham's deposition, he stated that Hill called him off of his 2 a.m. to 4 a.m. foot patrol, around 3:30 a.m. Hill asked him to return to the gatehouse because there was someone there for him. At first, he thought it was a tenant that had something for him. When he arrived at the gatehouse, he noticed a female, Daniela A. Giancola ("Giancola"), who was a nontenant of the complex, in a very intoxicated state. Neither Hill nor Latham knew Giancola. Giancola informed Latham that she needed to get home because she got into an argument with her boyfriend and "he threw her out of the car." After Giancola made several telephone calls and was unable to find a ride home, Latham decided to take her home instead of allowing her to walk. He figured it would take "no longer than 10, 15 minutes to get her there and [get] back." Latham never reported his departures from the premises. He testified that he "was back on the property at 3:48 a.m."
In his deposition, Morris testified that after the events occurred on August 17, 1995, he felt that Latham had abandoned his foot patrol rounds because "he was removing a possible security risk from the property." According to Morris' testimony, Giancola was drunk, loud, and abusive, and Hill and Latham described her to Morris as a security risk.
On August 15, 1995, two days before the incident, Willo and Trubiano had executed a consulting agreement with Morris and DRP, where Willo and Trubiano would acquire the security accounts from DRP and hire Morris as an independent consultant. In his deposition, Trubiano stated that the agreement had to be backed up for a week because things "couldn't [be done] that fast. We couldn't get the payroll stuff ready * * *." Therefore, a second consulting agreement was entered into on August 23, 1995. In his deposition, Morris also stated that the reason there were two different agreements was because "[t]he first one was the initial agreement [they] had and [they] were running into a payroll period and decided that [they] could make the 23rd as the point of sale or whatever."
Hill filed a motion for summary judgment on March 5, 1998. Thereafter, on April 29, 1998, Pine Ridge and Goldberg moved for summary judgment. On April 30, 1998, Willo and Trubiano also filed a summary judgment motion. Appellants filed briefs in opposition to the motions for summary judgment. In a judgment entry dated July 27, 1998, the trial court granted summary judgment in favor of Hill, Pine Ridge, Goldberg, Willo and Trubiano.
On October 22, 1998, DRP, Morris, and Latham moved for summary judgment. Appellants filed a brief in opposition on October 30, 1998. The trial court granted summary judgment in favor of DRP, Morris, and Latham on January 28, 1999. A notice of appeal was filed from that decision. However, this court dismissed the appeal for lack of a final appealable order. Cole v. Pine Ridge Apts. Co. II (June 1, 1999), Lake App. No. 99-L-028, unreported, 1999 WL 1458387, at 1. However, the Supreme Court of Ohio reversed our decision and remanded the matter to the trial court for further proceedings. Cole v. Pine Ridge Apts. Co. II (1999),87 Ohio St.3d 229. Thus, the trial court issued an entry on January 14, 2000, which reaffirmed its January 28, 1999 entry. Appellants filed a notice of appeal from that entry and assert the following as error:
 "[1.] The trial court erred in granting summary judgment to [appellees DRP, Hill, Latham, and Morris].
 "[2.] The trial court erred in granting summary judgment to [appellees Pine Ridge, Goldberg, Willo, and Trubiano]."
 As appellants' assignments of error are interrelated, they will be addressed in a consolidated fashion. In both assignments, appellants argue that the trial court erred in granting summary judgment in favor of appellees.
Before addressing appellants' arguments, we note that in order for a summary judgment to be granted, the moving party must prove:
 "* * * (1) [N]o genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." Mootispaw v. Eckstein (1996), 76 Ohio St.3d 383, 385.
 The Supreme Court stated in Dresher v. Burt (1996), 75 Ohio St.3d 280, 296, that:
 "* * * [T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. The `portions of the record' to which we refer are those evidentiary materials listed in Civ.R. 56(C), such as the pleadings, depositions, answers to interrogatories, etc., that have been filed in the case. * * *" (Emphasis sic.)
 If the moving party satisfies this burden, then the nonmoving party has the burden to provide evidence demonstrating a genuine issue of material fact. Civ.R. 56(E). If the nonmoving party does not satisfy this burden, then summary judgment is appropriate. Id. Appellate courts review a trial court's granting of summary judgment de novo. Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. The Brown
court stated that "we review the judgment independently and without deference to the trial court's determination." Id. An appellate court must evaluate the record "in a light most favorable to the nonmoving party." Link v. Leadworks Corp. (1992), 79 Ohio App.3d 735, 741. Further, a motion for summary judgment must be overruled if reasonable minds could find for the party opposing the motion. Id.
Appellants raise several issues for our review under both of their assignments of error. First, they claim that there were genuine issues of material fact as to whether DRP, Hill, Latham, and Morris had a duty under the "totality of the circumstances," including the security agreement between DRP and Goldberg, to protect JoAnne, Steve, and Lillian from intruders and unauthorized persons harming them and "unlawful or dishonest activity" on the premises and whether the tenants and the guests at Pine Ridge were third-party beneficiaries of the security contract between Goldberg and DRP.
Second, appellants argue that there were genuine issues of material fact as to whether the acts or omissions of DRP, Hill, Latham, and Morris were the proximate cause of: (1) Aquilla having the time and opportunity to enter the apartment; (2) Aquilla not being detected during the hour he was lurking on the property before he broke into the apartment; (3) Aquilla not being deterred because of an aborted foot patrol that would have placed Latham exactly where Aquilla was; and (4) creating a condition that was the proximate cause of JoAnne's death and the injuries to Steve and Lillian.
Third, appellants allege that there were genuine issues of material fact as to whether criminal activity at Pine Ridge was foreseeable.
Fourth, appellants maintain that there were genuine issues as to whether Pine Ridge and Goldberg had a duty under the "totality of the circumstances," including the security agreement between DRP and Goldberg, to protect JoAnne, Steve, and Lillian from harm from intruders and unauthorized persons on the premises and "unlawful or dishonest activity" where: (1) Pine Ridge and Goldberg assumed the duty of providing security as defined in the security agreement; (2) Pine Ridge and Goldberg were liable for the harm caused by the negligence of DRP and its guards based on the non-delegable nature of those duties; and (3) Pine Ridge and Goldberg created an environment where a third person might avail himself of the opportunity to commit such a crime because Pine Ridge and Goldberg had a dysfunctional maintenance policy regarding inspection for and correction of a known security hazard associated with the ground-level sliding doors, Pine Ridge failed to improve the lighting around the apartment where the murder occurred, and Pine Ridge and Goldberg failed to establish a communication link between maintenance, security, management, and the local police to remain informed of the type and amount of crime that took place at the apartment complex.
Lastly, appellants assert that there were genuine issues of material fact as to whether: (1) DRP transferred the Pine Ridge account to Willo on August 15, 1995; (2) a joint enterprise existed between DRP, Morris, Willo, and Trubiano for the security services provided during the period from August 15, 1995 to October 6, 1995; and (3) the second consulting agreement dated August 22, 1995, was a device which attempted to rewrite history after JoAnne's murder on August 17, 1995.
We will first examine whether summary judgment was proper as to DRP, Morris, Hill, and Latham, and whether their acts or omissions were the proximate cause of Aquilla entering the apartment, which resulted in the death of Joanne.
In order to maintain a wrongful death action on a theory of negligence, a plaintiff must show that: (1) there was a duty owed to the plaintiff's decedent; (2) there was a breach of that duty; and (3) there was proximate cause between the breach of duty and the death. Littletonv. Good Samaritan Hosp. Health Ctr. (1988), 39 Ohio St.3d 86, 92. The existence of a duty is in the first instance a question of law for the trial court even though negligence actions involve both questions of law and fact. Clemets v. Heston (1985), 20 Ohio App.3d 132, paragraph one of the syllabus. Under Ohio law, the existence of a duty depends on the injury's foreseeability. Menifee v. Ohio Welding Products, Inc. (1984),15 Ohio St.3d 75, 77. "The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. [Citations omitted]." Id. The foreseeability of harm generally depends on a defendant's knowledge. Thompson v. Ohio Fuel Gas Co. (1967),9 Ohio St.2d 116, 119-120.
"The issue of whether a defendant should have recognized the risks involved focuses on only those circumstances perceived by the defendant or those that should have been perceived at the time of the defendant's actions." Thomas v. Parma (1993), 88 Ohio App.3d 523, 527. If the evidence does not identify specific conduct that involved an unreasonable risk, there is no issue to submit to a jury. Id.
Moreover, there is ordinarily no duty to control the conduct of a third person by preventing him from causing harm to another, except in cases where a special relationship between the actor and the third person exists, which gives rise to a duty to control, or between the actor and another which gives the other the right to protection. Fed. Steel WireCorp. v. Ruhlin Constr. Co. (1989), 45 Ohio St.3d 171, 173. A security company's duty to a person injured by criminal activity on the premises depends on the terms of the security company's contract with the owner of the premises. Maier v. Serv-All Maintenance, Inc. (1997),124 Ohio App.3d 215, 221, citing Hill v. Sonitrol of Southwestern Ohio,Inc. (1988), 36 Ohio St.3d 36 and Eagle v. Mathews-Click-Bauman, Inc. (1995), 104 Ohio App.3d 792.
In this case, there was some evidence showing that Hill and Latham had the contractual duty to protect both persons and property at the apartment complex. Based on deposition testimony, there was evidence that the guards were required to perform foot patrol. Hill and Latham did not breach their duty to perform the required foot patrols, although Latham was called back to the gatehouse to deal with Giancola at around 3:30 a.m.
Furthermore, even if a special relationship existed requiring DRP and Morris to provide protection for an individual, the security company is liable only if the criminal actions of a third party were foreseeable.Hill, supra, at 39; Fed. Steel Wire, supra, at 174. No one is bound to prevent consequences which are beyond the range of probability. Feichtnerv. Cleveland (1994), 95 Ohio App.3d 388, 396.
The totality of the circumstances must be somewhat overwhelming before a business will be held to be on notice of and therefore under the duty to protect against the criminal acts of others. Reitz v. May Co. Dept.Stores (1990), 66 Ohio App.3d 188, 193-194. Here, there was no evidence presented which would demonstrate that the murder of JoAnne was a foreseeable act. The totality of the circumstances was not "somewhat overwhelming." Although there is documentation that various incidents of minor property crimes and some occurrences of domestic violence took place at the apartment complex, there was no proof offered that any murders had ever taken place. See Maier, supra, at 222 (where the court stated that "[c]omputer thefts and petty thefts are nonviolent crimes which do not render a murder foreseeable.") Hence, a reasonable person could not conclude that JoAnne's murder was reasonably foreseeable. DRP, Morris, Hill, and Latham had no duty to protect against the unforeseeable actions of a third party, Aquilla. Thus, the trial court properly granted summary judgment in favor of DRP, Morris, Hill, and Latham.
Again, even if a special relationship existed, DRP, Morris, Hill, and Latham are not liable since the criminal acts of the third party were not foreseeable. As discussed above, the murder in this case was not foreseeable based on the totality of circumstances; hence, there was no duty of care to protect appellants' decedent from the unforeseeable acts of Aquilla.
Additionally, there was no evidence showing that DRP, Morris, Hill, and Latham breached a duty that proximately caused injury. DRP and Morris' duty was limited to what was required under the contract between them and Pine Ridge and Goldberg. The agreement between DRP and Goldberg provided that:
"1. SERVICE
 "A. [D.R.P.] agrees to provide CUSTOMER with a uniformed security guard service at CUSTOMERS' facilities, in accordance with mutually agreed schedules.
 "B. [D.R.P.] will provide a compliment of uniformed guards, however many CUSTOMER deems necessary, to secure hours provided at * * * Pine Ridge Valley Apartments.
"* * *
"4. TERMS
"* * *
 "CUSTOMER understands and agrees that the duties of any security guards * * * of [D.R.P.] provided to CUSTOMER hereunder are limited to surveillance and assistance in the protection of life, property, * * * and duties of said employees of [D.R.P. do] not warrant CUSTOMER against any casualty."
 Hill and Latham testified that they were required to perform foot patrols every two hours beginning at 8 p.m., even though that language was not contained in the agreement between DRP, Morris, Pine Ridge, and Goldberg. Hill and Latham explained that one guard was to do the foot patrol while the other remained at the gatehouse. On the date of the murder, Latham was performing his foot patrol, when around 3:30 a.m., Hill called him back to the gatehouse to assist with Giancola, who was intoxicated. As a result, he did not finish his foot patrol. Aquilla stated that he had been in the complex since 2:30 a.m., spent thirty minutes walking around looking into cars, and proceeded to Steve and Lillian's apartment. After he tried to gain access into the apartment through the main entrance, he went to the window and tried to gain access through it for thirty minutes. Aquilla finally entered the apartment through the sliding glass door, which took about five minutes, and then he murdered JoAnne.
It is our view that at the time Aquilla tried to gain access through the main entrance of the apartment, which would have been between around 3:00 a.m. and 3:30 a.m., Latham was performing his foot patrol. Based on Latham's deposition testimony and Aquilla's affidavit, the evidence was insufficient to substantiate that Latham would have intercepted Aquilla at the critical time in question. Neither of their respective testimonies indicated that if Latham would have completed his foot patrol, he would have seen Aquilla, who was at the glass sliding door at around the time Latham was called back to the gatehouse. Therefore, we are unable to discern how Latham's failure to complete the foot patrol was the proximate cause of JoAnne's murder, as Latham would not have seen Aquilla. The trial court properly granted summary judgment in favor of DRP, Morris, Hill, and Latham.
We will now examine whether there were any genuine issues of material fact as to Goldberg and Pine Ridge. In Doe v. Beach House Dev. Co. (2000), 136 Ohio App.3d 573, a landlord's liability for criminal acts injuring its tenants was addressed. The Beach House court quoted from Doev. Flair Corp. (1998), 129 Ohio App.3d 739, and held that:
 "`In order to establish a claim for negligence, a plaintiff must establish a duty owed by the defendants [and] a breach of that duty which proximately results in an injury. Jeffers v. Olexo (1989), 43 Ohio St.3d 140
* * *. As a general rule, landlords have no duty to protect their tenants from the criminal acts of third persons. Thomas v. Hart Realty, Inc. (1984), 17 Ohio App.3d 83, 86 * * *; Sciascia v. Riverpark Apts. (1981), 3 Ohio App.3d 164, 166 * * *; Johnson v. Monroe Realty Co. (May 25, 1995), Cuyahoga App. No. 67964, unreported [1995 WL 322278].'" (Parallel citations omitted.) Beach House at 580.
 The duty of a landlord in such cases is set forth in Carmichael v. Colonial Square Apts. (1987), 38 Ohio App.3d 131. In Carmichael, a tenant, who had been assaulted in his own apartment, brought suit against his landlord alleging that the landlord was negligent in failing to provide adequate security in the common areas of the building. The court determined that generally, a landlord has the duty to take reasonable precautions to provide reasonable security in common areas, but does not have a duty to protect tenants from the criminal acts of third parties. Id. at 132. Specifically, the Carmichael court stated that:
 "* * * while the landlord has some duty to provide secure common areas in an apartment complex, he is not an insurer of the premises against criminal activity. * * * Thus, the duty on the landlord is only to take some reasonable precautions to provide reasonable security." Id.; see, also, Sciascia, 3 Ohio App.3d at 166.
 In Thomas, 17 Ohio App.3d at 85, the court stated that it found "* * * no common-law duty imposed by Ohio case law on landlords to afford reasonable protection against entry into the separately rented apartments in a multiple occupancy building, even in the face of foreseeable entries in a `high crime area.' [The court did] not believe [the] defendant had a common-law duty apart from his contractual obligations to install a proper security screen in the first instance, or in the second instance, to replace the screen he had removed."
Further, in Kelly v. Bear Creek Invest. Co. (Feb. 14, 1991), Cuyahoga App. No. 58011, unreported, 1991 WL 19152, at 3, the Eighth Appellate District determined that liability only attaches where a landlord should have reasonably foreseen the criminal activity in question, but failed to take reasonable precautions to prevent such activity, and this failure was the proximate cause of a tenant's harm. As previously stated, foreseeability is based upon whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of the act. Menifee, 15 Ohio St.3d at 77; see, also,Sayles v. SB-92 Ltd. Partnership (2000), 138 Ohio App.3d 476, 481; BeachHouse, 136 Ohio App.3d at 580; Eagle, 104 Ohio App.3d at 797.
In Reitz, 66 Ohio App.3d at 193, which dealt with a business and its customers, the court stated that:
 "In addition to the totality of the circumstances presented, a court must be mindful of two other factors when evaluating whether a duty is owed in cases such as this one. The first is that a business is not an absolute insurer of the safety of its customers. The second is that criminal behavior of third persons is not predictable to any particular degree of certainty. It would be unreasonable, therefore, to hold a party liable for acts that are for the most part unforeseeable. * * *" (Emphasis added.) See, also, Maier, 124 Ohio App.3d at 222.
 In applying the foregoing principles to the case at bar, at the time of JoAnne's murder, Pine Ridge and Goldberg had provided an intercom/buzzer system and two security guards to their tenants. There was also testimony that there was a random patrol scheduled for the area at night by local police officers. In addition, appellants have not provided this court with a copy of the lease agreement between Steve and Lillian with Pine Ridge and Goldberg, which would suggest that there was a provision in the lease that required stricter security measures.
Further, the evidence revealed that Aquilla entered the building through the glass sliding door by moving the door latch with his knife. Steve testified that there was no wood stick or anything in place to secure the door from the inside.
Since there is no evidence to support that there was anything in the lease agreement between Pine Ridge and Goldberg with Steve and Lillian regarding security, there was no breach. There was no evidence to suggest that other murders had occurred at the apartment complex. Furthermore, we conclude that to the extent that JoAnne, Steve, and Lillian required a landlord to provide reasonable security to tenants, Pine Ridge and Goldberg had complied with that duty. Therefore, under the totality of the circumstances presented, it is our view that the murder committed by Aquilla was not a foreseeable event for which Pine Ridge or Goldberg could be found liable under a negligence theory.
Even assuming that Pine Ridge and Goldberg breached their duty to provide reasonable security, appellants have failed to present any evidence upon which reasonable minds could differ that the breach of the duty to provide reasonable security was the proximate cause of JoAnne's death. Appellants have not established any genuine issues of material fact as to the duty on the part of Pine Ridge and Goldberg to provide security and, even assuming such a duty was breached, that the landlord's breach of that duty was the proximate cause of any injury. For the foregoing reasons, summary judgment was proper as to Pine Ridge and Goldberg.
Lastly, we turn our attention to appellants' argument that summary judgment was inappropriate as to Willo and Trubiano. Willo, Trubinao, DRP, and Morris all agree that at the time of JoAnne's murder, DRP and Morris were the providers of security to the apartment complex. Two days before the incident, Willo and Trubiano had executed an agreement with Morris and DRP. However, in Trubiano's deposition, he stated that the agreement had to be backed up for a week. In his deposition, Morris verified Trubiano's testimony by stating that "[t]he first one was the initial agreement [they] had and [they] were running in a payroll period and decided that [they] could make the 23rd [of August] as the point of sale * * *." Moreover, Hill and Latham, the security guards on duty the morning of the murder, were employed by DRP and Morris, not Willo and Trubiano.
Therefore, there is no factual dispute between all the parties involved with the consulting agreement that Willo was to take over the security accounts for DRP on August 23, 1995. Since there were no genuine issues as to a material fact, summary judgment was proper as to Willo and Trubiano.
For the foregoing reasons, appellants' assignments of error are not well-taken. The judgment of the Lake County Court of Common Pleas is affirmed.
NADER, J., concurs, GRENDELL, J., dissents with Concurring/Dissenting Opinion.
[1] On November 25, 1998, appellants voluntarily dismissed Aquilla pursuant to Civ.R. 41(A)(1)(a).