[Cite as *Jackson v. Huppert*, 2012-Ohio-2934.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 97764

---

## CORNELIA JACKSON, ADMINISTRATOR

### PLAINTIFF-APPELLANT

vs.

## STEFAN HUPPERT

### DEFENDANT-APPELLEE

---

### JUDGMENT:
### AFFIRMED

---

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-750623

**BEFORE:** Blackmon, A.J., Jones, J., and Keough, J.

**RELEASED AND JOURNALIZED:** June 28, 2012

**ATTORNEYS FOR APPELLANT**

David A. Bressman
Law Office of David A. Bressman
4230 Tuller Road
Suite 101
Dublin, Ohio 43017

Michael D. Falleur
1625 Bethel Road
Suite 205
Columbus, Ohio 43220

Kimberly S. Wells
P.O. Box 701
Blacklick, Ohio 43004


**ATTORNEY FOR APPELLEE**

Shawn W. Schlesinger
Koeth, Rice & Leo Co., L.P.A.
1280 West Third St., 3rd Floor
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, A.J.:

{¶1} Appellant Cornelia Jackson, Administrator, ("Jackson") appeals the trial court's granting summary judgment in favor of appellee Stefan Huppert. Jackson assigns the following two errors for our review:

**I.  Ohio Law, and public policy, do not allow the defendant to assist Rochelle Hooks in committing suicide.  The trial court's decision granting defendant's motion for summary judgment allows for one to assist another in ending a life without liability.   In this case, defendant owed a duty to Rochelle Hooks to not assist her in committing suicide because he knew that such was her intention, he provided her with counseling about it, and then drove Rochelle to Edgewater Park where she died.  The law and facts are such that the case should have been heard by a jury.**

**II.  The trial court incorrectly granted defendant's motion to strike certain exhibits attached in plaintiff's reply to the motion for summary judgment when each exhibit was admissible.**

## Facts

{¶2} On September 7, 2007, Rochelle Hooks ("Hooks") was pronounced dead after committing suicide by drowning herself at Edgewater Park the evening before.   She was 36 years old.

{¶3} In 2000, Hooks was diagnosed with multiple sclerosis ("MS"). Because of the symptoms of MS, Hooks became increasingly disabled. In 2005, she could not walk without a walker. In 2007, her condition worsened to the point she could no longer supervise and care for her teenage sons, who went to live with Hooks's mother, Cornelia Jackson. Hooks never said she was depressed, but her family could tell that she was depressed at times. Her medical records also indicated she was suffering from depression.

{¶4} Huppert first met Hooks on August 28, 2007, which was ten days prior to her suicide. He worked as a driver for Diversified Transportation, which provides transportation for disabled people to and from medical appointments. Huppert was also an ordained Lutheran minister who worked as a substitute pastor.

{¶5} On August 28, 2007 and September 3, 2007, Huppert drove Hooks to and from her physical therapy appointments. Huppert stated that although Hooks walked slowly, she was able to walk down the front stairs with her walker. While driving Hooks to and from her medical appointments, Huppert and Hooks engaged in casual conversations about Hooks's health and family. During the first transport, Hooks was in a lot of pain after her therapy and told Huppert that a couple of times in the past she had thought about ending her life. She also expressed excitement, however, regarding upcoming events with her teenage sons. Therefore, Huppert believed Hooks's suicidal thoughts were past feelings. Hooks also discussed the isolation she felt from her family

and sadness over the fact that her mother had to raise Hooks's sons because Hooks was unable to care for them.

{¶6} The second time that Huppert transported Hooks, she expressed fear of being placed in a nursing home. She was told that she could no longer live in her Section 8 rental home because her sons no longer lived with her. She, however, seemed "more upbeat" on the way home from her appointment. Hooks told Huppert that she liked talking to him because she felt he did not judge her and asked him for his telephone number. Huppert gave it to her because he felt bad that she did not seem to be receiving emotional support from her family. According to Huppert, he never offered Hooks spiritual counseling, but merely listened to her.

{¶7} On September 6, 2007, Huppert worked the 8:30 a.m. to 5:00 p.m. shift at Diversified Transportation. At around 12:30 p.m. Huppert received a call from Hooks. She asked if Huppert would come over after work to talk. Huppert agreed because he felt sorry for her.

{¶8} After his shift ended, Huppert drove his private car to Hooks's house. Shortly after he arrived, Hooks stated she wanted to go for a drive to the lake to "get some lake air." The hour prior to them leaving, Hooks made a sandwich for herself and received treatment from her home health aide. According to Huppert, there was nothing about her behavior that would alert him to her pending suicide. In fact, even Hooks's mother testified that she had spoken with Hooks on the telephone that day around 4:30

p.m., and Hooks had expressed excitement about seeing her sons play football the next day.

{¶9} Around 7:15 p.m., Huppert and Hooks arrived at Edgewater Park. Huppert parked near the pier so that Hooks would not have far to walk. They sat for the next hour on a bench on the pier. They mostly talked about Hooks's sons and how proud of them she was. Hooks also expressed disappointment regarding the fact her sons lived with her mother. According to Huppert, Hooks did not mention that she wanted to commit suicide.

{¶10} At approximately 8:10 p.m., Huppert received a call on his cellular phone, which he had left in his car parked a short distance away. He walked to the car and talked on the phone with a co-worker for a few minutes and used his asthma inhaler. When Huppert turned around to return to Hooks, he saw her walking with her walker towards the edge of the pier, which was a short distance from the bench. Because of how Hooks was positioned, leaning towards the edge of the pier, Huppert stated that it appeared that she was planning on going into the water. Huppert immediately tried to stop Hooks from entering the water by grabbing her wrist, but Hooks responded "Don't try and stop me. I have to do this." Hooks yanked her wrist away and swung her walker towards him as she entered the water. She did not resurface and because of the distance from the pier to the water, Huppert could not reach her. Huppert immediately called 911. Eventually the Coast Guard responded to the scene and removed Hooks's body from the lake. She was removed from life support the following day.

**{¶11}** Jackson refused to believe that her daughter committed suicide. Because of Jackson's continued complaints to the police that her daughter did not commit suicide, the police asked Huppert to take a polygraph test. He agreed to take the test and passed. Criminal charges have never been filed against Huppert.

**{¶12}** On March 10, 2011, Jackson filed a complaint against Huppert alleging a claim for wrongful death.[1] Huppert answered the complaint and filed a motion for summary judgment, which Jackson opposed. The trial court granted the summary judgment without opinion.

## Motion for Summary Judgment

**{¶13}** In her first assigned error, Jackson argues the trial court erred by granting summary judgment in favor of Huppert.

**{¶14}** We review an appeal from summary judgment under a de novo standard of review. *Baiko v. Mays*, 140 Ohio App.3d 1, 746 N.E.2d 618 (8th Dist.2000), citing *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987); *N.E. Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 699 N.E.2d 534 (8th Dist.1997). Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as

---

[1]Jackson had originally filed a complaint on September 8, 2009. Following discovery, however, she voluntarily dismissed her complaint without prejudiced on April 5, 2010.

a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion that is adverse to the non-moving party.

{¶15}  Jackson contends that summary judgment was improperly granted to Huppert because he had a special relationship with Hooks; therefore, as a matter of law, he had a duty to prevent Hooks from harming herself.

{¶16} To maintain a wrongful death action on a theory of negligence, a plaintiff must show three elements: a duty owed to the decedent, a breach of that duty, and proximate causation between the breach of duty and the death.  *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92, 529 N.E.2d 449 (1988), citing *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122, 214 N.E.2d 213, paragraph one of the syllabus (1966).  Generally, under Ohio Law there is no duty to act to prevent harm to a person.  *Littleton* at 92.  An exception to this general rule arises when a special relationship exists between the actor and the person.  *Id*. "Such a 'special relationship' exists when one takes charge of a person whom he knows or should know is likely to cause bodily harm to others [or self] if not controlled."  *Id.*  An example of a "special relationship" is the parent-child relationship, where a parent may be held liable in certain situations for the minor child's wrongful act.  *Huston v. Konieczny*, 52 Ohio St.3d 214, 556 N.E.2d 505 (1990).  Medical providers may also have a "special relationship" with their patients.  *Douglass v. Salem Comm. Hosp.*, 153 Ohio App.3d 350, 794 N.E.2d 107 (7th Dist.2003).

**{¶17}** No special relationship existed between Huppert and Hooks at the time of the incident. That night, Huppert was not driving Hooks to a medical appointment. Instead, Huppert was off-duty when he met with Hooks as a social friend. Although Hooks had medical problems there was no evidence that she suffered from any mental infirmities. She was a fully functional adult except for the physical symptoms she suffered from the MS. Because there was no special relationship beyond friendship between Hooks and Huppert, Huppert did not have a duty to protect Hooks from harming herself.

**{¶18}** Even if there was a special relationship, there is no evidence that Huppert aided Hooks in committing suicide. Although Huppert took Hooks to Edgewater Park, he stated Hooks was the one who chose to go to the lake. She told Huppert that she wanted to go to the lake to get "some lake air." She did not mention her intention to commit suicide. Hooks walked unassisted to the edge of the pier while Huppert was standing beside his car with his back turned. When he saw what she was about to do, he ran towards her and attempted to grab her wrist, but Hooks twisted away and told him "to leave her alone" and that "she had to do this." When Hooks went into the water, she never resurfaced, and due to the distance from the pier to the water below, Huppert could not reach her. He immediately called 911. Therefore, the evidence indicates that when Hooks's intentions became clear to Huppert, he attempted to stop her from succeeding.

**{¶19}** There was also no evidence that Huppert could have foreseen Hooks's suicide. In *Thomas v. Parma*, 88 Ohio App.3d 523, 624 N.E.2d 337 (8th Dist.1993), a

prisoner committed suicide while in police custody, resulting in the family suing the city. After reviewing the facts, we held that there was "no evidence in the record that the officers had any reason to believe that the decedent posed a risk of suicide. Since the suicide was not foreseeable, we view it as an intervening force for which appellees cannot be held responsible." *Id.* at 531.

{¶20} Likewise, in *Schoenfield v. Navarre*, 164 Ohio App.3d 571, 2005-Ohio-6407, 843 N.E.2d 234 (6th Dist.), a prisoner committed suicide while in custody. In affirming summary judgment in favor of the defendant, the Sixth District observed that prior to the suicide the prisoner was upset because of marital problems; but he appeared calm and rational and did not exhibit any signs he intended to harm himself. The court held that "although [the prisoner's] suicide was very tragic, nothing in the record demonstrates obvious signs of what his intentions were or that the police failed to act appropriately under the circumstances presented." *Id.* at 578.

{¶21} Here, Hooks had previously told Huppert that she had thoughts of suicide in the past; she never told Huppert that she had present thoughts of committing suicide. Also, after mentioning her past intentions, Hooks mentioned her excitement regarding future events with her sons. In fact, while Huppert sat with Hooks on the pier, Hooks expressed excitement regarding watching her son play football the next day. Thus, while Hooks's suicide is tragic, there is no evidence that Huppert could have anticipated her intention to end her life.

**{¶22}** Jackson also contends that Huppert had provided officers with conflicting facts regarding what had occurred. However, this information is contained in the police reports, which were stricken from the record. Additionally, the inconsistencies are not sufficiently material to have changed the outcome of the trial court's decision. Accordingly, Jackson's first assigned error is overruled.

## Motion to Strike Exhibits

**{¶23}** In her second assigned error, Jackson argues the trial court erred by granting Huppert's motion to strike exhibits attached to her motion in opposition to summary judgment. The stricken exhibits included unauthenticated police reports, an affidavit and email from the Coroner, Erica Armstrong, Huppert's pro se answer from the first case, and an unauthenticated map and directions.

**{¶24}** A trial court's decision to grant or deny a motion to strike is within its sound discretion and will not be overturned on appeal unless the trial court abused its discretion. *Abernethy v. Abernethy*, 8th Dist. No. 81675, 2003-Ohio-1528, at ¶ 7.

**{¶25}** Civ.R. 56(C) provides an exclusive list of materials that a trial court may consider when deciding a motion for summary judgment. Those materials are "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact." Civ.R. 56(C). The court may consider documents that are not expressly mentioned in Civ.R. 56(C) if those documents are accompanied by a personal certification that they are genuine and are incorporated by reference in a properly framed affidavit pursuant to Civ.R. 56(E). *Drawl v. Cornicelli*,

124 Ohio App.3d 562, 569, 706 N.E.2d 849 (11th Dist.1997), citing *Martin v. Cent. Ohio Trans. Auth.*, 70 Ohio App.3d 83, 89, 590 N.E.2d 411 (10th Dist.1990).

**{¶26}** The trial court did not abuse its discretion by striking the police reports because they are not listed as documents to be considered under Civ.R. 56(C). The police reports could have been admissible if they were properly authenticated by an affidavit. However, because Jackson failed to file an affidavit the reports were unauthenticated and not admissible. *See Stevenson v. Prettyman*, 193 Ohio App.3d 234, 2011-Ohio-718, 951 N.E.2d 794, ¶ 25-28 (8th Dist.).

**{¶27}** The trial court did not abuse its discretion by striking the coroner's affidavit and email. The trial court had ordered expert reports to be produced no later than September 6, 2011. Jackson did not submit an expert report from the coroner. Instead, on November 1, 2011, she attached to her motion in opposition to summary judgment, an email exchange between the coroner and Jackson's counsel. Such an email exchange is not an expert report. The coroner only responded to questions asked of her and did not detail how she came to her conclusions. Moreover, in the email, the coroner failed to state opinions to a reasonable degree of probability. *Stinson v. England*, 69 Ohio St.3d 451, 1994-Ohio-35, 633 N.E.2d 532, paragraph one of syllabus. The coroner's affidavit only detailed the coroner's qualifications, which is irrelevant once the email was stricken.

**{¶28}** The trial court did not abuse its discretion by striking Huppert's pro se answer to Jackson's prior complaint because Jackson voluntarily dismissed the complaint without prejudice. Once the original complaint was voluntarily dismissed without

prejudice, it was as if the case was never filed.  *Lewis v. Fairview Hosp.*, 156 Ohio App.3d 387, 2004-Ohio-1108, 806 N.E.2d 185 (8th Dist.)  Moreover, prior to the case being dismissed without prejudice, the trial court permitted Huppert to file an amended answer.  An amended pleading acts as a substitute or replacement of the original pleading.  *Widder & Widder v. Kutnick*, 113 Ohio App.3d 616, 622, 681 N.E.2d 977 (8th Dist.1996).

**{¶29}** The trial court also properly struck the unauthenticated map and directions. These are not materials that are authorized under Civ.R. 56(C) to be considered in determining a motion for summary judgment; therefore, it was necessary that they be authenticated by affidavit.

**{¶30}** Jackson also contends that Huppert's counsel stipulated to the authenticity of the exhibits; however, there is no evidence of such a stipulation in the record.  Even if the court erred in striking the exhibits, no prejudicial harm occurred.  Jackson intended to include the police reports to show that Huppert gave inconsistent statements.  However, none of the reports were written statements by Huppert, but were written by the officers. Also, the discrepancies were so minor that they would not have changed the outcome of the court's decision.

**{¶31}** Likewise, the inclusion of the coroner's email would not have changed the outcome.  Although the coroner did conclude that Hooks's death was from "violence of an undetermined origin," she explained that meant Hooks's death was not from natural causes.  She stated that she did not have sufficient information to classify the death as

either homicide, accident, or suicide. The map and directions played no central role regarding the issues before the trial court; therefore, their exclusion also did not affect the trial court's decision. Accordingly, Jackson's second assigned error is overruled.

**{¶32}** Judgment affirmed.

It is ordered that appellee recover from appellant his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, ADMINISTRATIVE   JUDGE

LARRY A. JONES, SR., J., and
KATHLEEN ANN KEOUGH, J., CONCUR